UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSE ANIBAL MENDEZ | : | NO. 3:02CR274(SRU) |
| | : | NO. 3:04CV1228(SRU) |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | March 14, 2005 |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION
## TO PETITIONER'S MOTION TO VACATE SENTENCE

By motion filed on July 21, 2004,[1] the petitioner, Jose Anibal Mendez, seeks to vacate,

set aside and correct an 87 month term of imprisonment that was imposed by this Court on

October 23, 2003 following his conviction for Possession with Intent to Distribute and

Distribution of 5 Grams or More of Cocaine Base, in violation of 21 U.S.C. §841(a)(1).

Following imposition of sentence, the Government moved to dismiss Counts One, Three, and

Four of the indictment, and the Court granted the motion.  The petitioner claims that he is

entitled to have his federal sentence reduced to one which falls within what he erroneously

purports to be his appropriate guideline range of 37 to 46 months.  For the reasons set forth

herein, the petitioner's motion should be denied.

## BACKGROUND

A.    **The Federal Proceedings**

On October 2, 2002, the petitioner and a co-conspirator, Manuel Polanco, were named in

a five count Indictment returned by a federal grand jury sitting in Hartford.  Count One charged

the petitioner and his co-defendant with Conspiracy to Possess With Intent to Distribute and

---

[1] References to the petitioner's submission use the filing date inasmuch as the form 2255
motion is dated January 15, 2004, the Memorandum of Law is dated June 20, 2004, the certification
page is dated July 16, 2004, and the actual file stamped date is reflected as July 21, 2004.

Distribution of 50 Grams or More of Cocaine Base ("crack"), Count Two charged both men with

Possession With Intent to Distribute and Distribution of 5 Grams or More of Cocaine Base, and

Counts Three and Four charged the two with Possession With Intent to Distribute and

Distribution of 50 Grams or More of Cocaine Base.[2]   On February 20, 2003, petitioner appeared

before this Court with retained counsel and pleaded guilty to Count Two of the Indictment which

charged a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)B)(iii) and 18 U.S.C. §2.   The

transcript of the February 20, 2003 Rule 11, Fed.R.Crim.P., change of plea proceeding is

attached as Exhibit A and referred to hereinafter as "Tr. 2/20/03 at ___."

On October 23, 2003, the petitioner appeared before this Court for sentencing. The Court

sentenced the defendant on Count Two to a term of imprisonment of 87 months to be followed

by a period of supervised release of four years.  The transcript of the October 23, 2003 sentencing

hearing is attached as Exhibit B and is referred to hereinafter as "Tr.10/23/03 at ___."  Also on

October 23, 2003, after sentence was imposed,  the Government filed a motion to dismiss Counts

One, Three and Four of the Indictment.  The motion was granted on that same date. Tr.10/23/03

at 13.

The petitioner took no direct appeal.[3]

On or about July 21, 2004, the petitioner filed the instant Motion to Vacate pursuant to 28

U.S.C. §2255.[4]  Petitioner is currently incarcerated at the Federal Correction Institution at Fort

---

[2] Count Five of the Indictment related to forfeiture matters and is not otherwise relevant to the instant petition.

[3] At the conclusion of the sentencing hearing, the Court  fully apprized the petitioner of his right to appeal.  Tr. 10/23/03 at 12-13.

[4] The Government notes that the petition filed in this case does not contain a page 12. Counsel has inquired of the Clerk's Office and has been advised that neither the original, nor the uploaded copy of the petition has a page 12.

Dix, New Jersey.

**B.    The Facts (Possessions and Distributions of Cocaine Base)**

As reflected in the Presentence Report at ¶¶ 6 - 11, the underlying facts supporting the Indictment returned by the grand jury were relatively simple and straight forward, and the evidence itself was overwhelming.   Those facts included the following:

During the month of June 2002, a Drug Enforcement Administration (DEA) Mobile Enforcement Team initiated an investigation into the narcotics activities of several violators operating in Hartford, Connecticut.  As part of the investigation, during the month of September 2002, two DEA Confidential Sources (hereinafter referred to as CS-1 and CS-2) advised agents of the mobile team that they knew two subjects, Jose Anibal Mendez and Manuel Polanco, who were active crack cocaine distributors in Hartford, Connecticut.

On September 5, 2002, both confidential sources made a controlled purchase of approximately 9.9 grams of cocaine base (crack) from Jose Mendez after several preliminary conversations with Mendez and Polanco occurred relative to the deal.  Jose Mendez drove to the drug deal in a tan 1992 Acura Legend, bearing Connecticut registration 810- RGH which was registered to Manuel Polanco of 4 Baldwin Street, Hartford, Connecticut.  During the deal, Mr. Mendez stated to CS-2 that the subject Acura was equipped with a "trap" (hidden compartment). Mr. Mendez then showed the hidden compartment to CS-2 and stated that the vehicle belonged to Mr. Polanco and that he (Mendez) and Polanco had a second vehicle that also contained a hidden compartment.  However, Mendez did not specify the make or model of the second vehicle.  CS-2 observed two or three more bags of suspected crack cocaine in the hidden compartment.

On September 10, 2002, both confidential sources, under the direction and control of

DEA, purchased approximately 38 grams of crack from Mendez.[5]  Again, Mendez utilized the tan Acura to consummate the deal.  Thereafter, on September 11, 2002, both confidential sources, under the direction and control of the DEA, purchased approximately 60 grams of crack directly from Mendez.  Finally, on September 19, 2002, both confidential sources, under the direction and control of the DEA, purchased approximately 200 grams of crack from Polanco and Mendez, who again utilized the tan Acura to consummate the deal.

Arrest warrants then issued for Manual Polanco and Jose Anibal Mendez pursuant to the indictment returned against them.  On October 9, 2002, Mendez was arrested along with Polanco at 195 Sigourney Street in Hartford, Connecticut.   A search of the apartment resulted in the discovery of a notebook containing names and figures/numbers which, based on the agents' experience, were consistent with a drug ledger.  Also seized was a photograph of Mendez with a pistol. See, generally, PSR at ¶¶6 - 11.

It is noteworthy that separate and apart from his written agreement to plead guilty to Count Two of the Indictment,[6] the petitioner and his counsel stipulated to the following relevant offense conduct:

> On or about September 10, 2002, he and Manuel Polanco knowingly and intentionally distributed approximately 38 grams of crack cocaine to another person.

> The defendant further agrees and stipulates that on September 11, 2002, he and Manuel Polanco distributed approximately 60 grams of crack cocaine to another person.

---

[5] DEA agents monitored (listened to) the telephone conversations between the petitioner Mendez and the confidential sources setting up the transaction.  Further, the agents conducted physical surveillance to corroborate the meeting and Mendez's actual entry of the car being used by the confidential sources.  Tr. 2/20/03 at 31 - 32.

[6] The February 20, 2003 written plea agreement between the petitioner and the Government was filed in open court and is attached as Exhibit C.  References to the plea agreement are denoted as "Plea Agreement at ___."

The defendant further agrees and stipulates that on or about September 19, 2002, he and Manuel Polanco distributed approximately 200 grams of crack cocaine to another person.

Plea Agreement at 7.

### C. The Plea Hearing

On February 20, 2003, petitioner appeared before the Court with his retained counsel, Attorney Matthew B. Smith.[7]  During the plea hearing, the Court carefully inquired into the court interpreter's qualifications as a Spanish translator and her ability to communicate effectively with the petitioner.  Id. at 3.  The Court advised the petitioner that it was in no hurry and encouraged him to alert the Court if he had any questions or concerns as the hearing proceeded.  The petitioner affirmatively stated that he understood.  Id.

The Court then reminded the petitioner of his right to remain silent, his right to stop answering questions at any time, and his right to counsel, including court-appointed counsel if at any time he could no longer afford counsel.  In each instance, the petitioner advised that he understood these rights. Id. at 4 - 5.  After being placed under oath, the petitioner stated he was not under the care of any doctor or psychiatrist, and had not ingested any narcotic drugs, prescription medications or any alcohol within the previous 48 hours.  Id. at 6 - 7.

The petitioner confirmed that his mind was clear on the day of the plea and that he understood what was occurring.  Further, petitioner advised the Court that he had had conversations with Attorney Smith, and understood what his counsel had told him. Id. at 8 - 9. The court then inquired of counsel as follows:

---

[7] Attorney Smith represented the petitioner at both the February 20, 2003 plea proceedings and the October 23, 2003 sentencing hearing.  Attorney Smith, who has practiced law for approximately 16 years and is admitted before the U.S. District Court for the Districts of Rhode Island, Massachusetts, New Jersey and the Eastern District of Wisconsin, appeared *pro hac vice* with Louis Cappuccio, Jr., Esq. serving as local counsel.

THE COURT: Mr. Smith, have you had any difficulty communicating with Mr. Mendez today?

MR. SMITH: None whatsoever.  In fact today was one of my better days with him.  *I've had any number of conversations with him regarding this case with, obviously, the use of a Spanish interpreter from my office, never had a problem communicating and I feel very, very confident today that he understands fully what he's doing.*  (Emphasis added).

Id. at 9.

The fact that petitioner had had various meetings and conversations with his retained counsel was confirmed by petitioner, as was the fact that he was satisfied with the representation he had received.  Id. at 10.  The Court determined that petitioner had received a copy of the Indictment in the case, had had the Indictment translated for him, and had discussed the charges in the Indictment with his attorney.  Id.

The Court then asked the prosecutor to describe the nature of the offense to which the petitioner would be pleading guilty and the penalties, *both the maximum and minimum*, for that offense.  Before the prosecutor was permitted to do so, however, the Court directed petitioner to "listen carefully" to what was going to be said and to advise the Court if he had any questions.  Id. at 9 - 10.  AUSA Boyle advised the petitioner that the offense involved the distribution of 5 grams or more of cocaine base ("crack") on or about September 10, 2002, which constituted a violation of 21 U.S.C. §841(a)(1).  Petitioner was further, and specifically, advised that the offense carried a maximum prison sentence of 40 years, a mandatory minimum prison sentence of 5 years, a fine of as much as $2,000,000, a mandatory special assessment of $100, and a term of supervised release of at least four years and possibly as much as life.  Petitioner responded to questions posed by the Court and confirmed that he understood the charge and the penalties he

faced if he were to plead guilty.  Id. at 11.

The Court then carefully reviewed with the petitioner the various rights he would be giving up by pleading guilty, including, but not limited to, the right to a jury trial, the right to confront the prosecution's witnesses and to call his own witnesses, and the right to testify or not testify as he saw fit.  Id. at 13 - 14.   Petitioner advised the Court that he understood what he would be giving up by pleading guilty. Id.

The Court explained to petitioner that if he did not like his sentence, he would not be permitted to withdraw his guilty plea, but rather all he could do was appeal that sentence. Specifically, the Court advised petitioner that,

> THE COURT: I want to spend a moment on your right to appeal.  If you plead guilty today, you're going to be found guilty.  You're not going to be able to come back after you're sentenced and withdraw your guilty plea or appeal your conviction.  *At that point, if you think you've been sentenced unfairly, all you can do is appeal your sentence.  Do you understand?*
>
> THE INTERPRETER: *Yes.*  (Emphasis added).

Id. at 14.

Petitioner's counsel confirmed to the Court that he had discussed this issue with his client.

Significantly, the counsel advised the Court that,

> MR. SMITH . . . I explained to [petitioner] that there is a difference between appealing guilt and appealing a sentence that this court might give, and that my discussions between the U.S. Attorney and Mr. Mendez about what his sentence may not be what Probation or the Court ultimately determine it to be.  If the Court sentenced him to more than the appropriate guideline, then we would have a right to appeal that sentence, just as the government would if you decided to go below the Sentencing Guideline and the government would have a right to appeal, and that's essentially how I explained the appealability of the sentence to him.

Id. at 15.

The Court explained to the petitioner that it would be making the determination of the

quantity of drugs involved in the case, that the offense involved in the case was a felony, and that a conviction would lead to the petitioner's deportation from the United States.  After a brief consultation with Attorney Smith, the petitioner acknowledged that he understood each of these facts.  Id. at 16 - 17.

Next, the Court carefully and methodically established that there was a seven (7) page written plea agreement to be filed with the Court.  The petitioner confirmed that he had had the agreement translated and read to him, had discussed the agreement with his counsel, understood its terms, and had signed the agreement on both page 6 and page 7 (Stipulation of Offense Conduct).  Id. at 18 - 19.  In reviewing the provisions of the plea agreement for the record, Government counsel specifically noted "that Mr. Mendez is subject to a potential sentence of 40 years in prison [and] a mandatory minimum term of imprisonment of five years . . . "  Id. at 19 - 20.  The prosecutor also recited the fact that the petitioner recognized that the Sentencing Guidelines were applicable in the case, and both parties reserved their right to appeal the Court's sentence if they believed it was inconsistent with prevailing law.  Id.  at 20.

After clarifying an issue and correcting the record concerning the amount of time to which the petitioner could be sentenced for a violation of his term of supervised release, the Court turned its attention to the plea agreement.  Specifically, the Court made certain that the petitioner understood the last page of the plea agreement called the Stipulation of Offense Conduct, and assured itself that the petitioner had not only read the Stipulation, but that he agreed the criminal activities described therein had actually occurred.  Id. at 23.

Particularly relevant to the instant Motion to Vacate is the next portion of the Court's canvas of the petitioner's plea.  That is, the Court asked the petitioner several times if the plea agreement contained each and every promise that had been made to him.  The inquiry proceeded

-8-

as follows:

> THE COURT: All right. Thank you. Mr. Mendez, before this [plea agreement] letter and stipulation were prepared, your lawyer and the prosecutor discussed the circumstances under which you would plead guilty and *I want to make sure that this written document completely reflects the terms under which you have decided to plead guilty. So what I'm asking you now is there any other promise or statement that you're relying upon in deciding to plead guilty today that is not in this written document?*
>
> THE INTERPRETER: *No, it's fine.*
>
> THE COURT: All right. This is the entire deal?
>
> THE INTERPRETER: And there is nothing else that's not in that, like what?
>
> THE COURT: I want to make sure that no one has told you something about what's going to happen or how you'll be treated or whatever that isn't in here.
>
> THE INTERPRETER: Yes.
>
> THE COURT: Is that correct?
>
> THE INTERPRETER; Yes.
>
> THE COURT: *There's nothing else?*
>
> THE INTERPRETER: *No.*     (Emphasis added).

Id. at 23 - 24.

The Court also made certain that the petitioner understood that if he were to plead guilty then the sentence he would face was "at least five years and up to 40 years in prison," a matter which the petitioner said he did in fact understand. Id. at 25. The Rule 11, Fed.R.Crim.P., transcript makes it clear that the petitioner was paying attention to these matters as they were being discussed as evidenced by his request to talk with his lawyer when the Court advised him that parole had been abolished in the federal system and he would not be released early. Id. at 26.

Immediately after the discussion about parole, the Court turned the petitioner's attention to the fact that his sentence would be based on information given to the Court about the petitioner and the circumstances of the offense. The Court clearly advised the petitioner that ". . . if I learn information that causes me to sentence you more harshly than you expect or more harshly than you think is fair, you are not going to be permitted to come back and withdraw your guilty plea." The petitioner acknowledged that he understood this fact. Id. at 27 - 28. The Court explained to the petitioner that his sentence would be driven by two factors: "the seriousness of [his] offense, which in [his] case [would] depend largely on the quantity of drugs" and his prior criminal record. Id. at 28.

After the petitioner stated that he had discussed with his lawyer how the Sentencing Guidelines might apply in his case, the Court cautioned the petitioner as follows:

> THE COURT: All right. Now, I want to be sure that you understand that whatever advice or prediction your lawyer has made about your likely sentencing range under the guidelines, it's not binding upon me, that I have to make my own independent determination of how the guidelines apply in you case. Do you understand?
>
> THE INTERPRETER: Yes, Your Honor.
>
> THE COURT: Mr. Smith, have you had a chance to discuss the Sentencing Guidelines? I think you mentioned this before, that you have had that opportunity. Are you confident Mr. Mendez understands that any prediction or advice you may have given him is not binding upon the court?
>
> MR. SMITH: Absolutely, Your Honor. I've discussed this, as I indicated to the court earlier, on any number of occasions. I've discussed in general terms how the guidelines apply and how they may apply in his case, and I mean, I'm fairly confident I can, having done this for nine or ten years now, that I can somewhat accurately – I'm trying to search – somewhat accurately indicate where the court might end up, but he's fully aware that the court is going to make its own independent determination and that is outlined to him. It is my understanding and U.S. Attorney's understand that this is not binding on the Court. He understands that Probation will visit with him with me and that Probation will go a long way towards determining which way the Court is going. I'm satisfied that he

-10-

understands that, Judge.

Id. at 28 - 29.

It was only after the Court had made all of the foregoing inquiries and satisfied itself that the petitioner knew what he was doing and understood the consequences of a guilty plea that the Court had the prosecutor state for the record what the Government was prepared to prove at trial. Once the petitioner confirmed that he had in fact possessed 5 grams or more of crack cocaine on September 10, 2002 and he intended to distribute that crack, the Court permitted the petitioner to be put to plea. The petitioner then entered a plea of guilty. Id. at 30 - 34.

Finally, during the February 20, 2003 plea proceedings, the Court urged the petitioner to cooperate with the Probation Officer who would be preparing the Presentence Report in the case. The Court specifically told the petitioner that the PSR "is the most important piece of information that [the Court would] rely upon when it c[a]me time to sentence" the petitioner. In addition, the Court assured the petitioner that the Probation Officer worked for the Court and not the prosecutor. Id. at 35 -36.[8]

The Court then scheduled a sentencing date. The original date was eventually continued several times until it was set for October 23, 2003. (Record).

The United States Probation Office prepared a presentence report using the November 1, 2002 Sentencing Guidelines Manual in which it computed the petitioner's adjusted offense level to be a Level 29, his criminal history category to be Level I, and his corresponding sentencing range to be 87 to 108 months. Pursuant to § 2D1.1(a)(3)(c)(3), the petitioner's base offense level was established at 34. (The quantity of cocaine base involved in the case was calculated to be

_____

[8] Significantly, nowhere in the PSR in this case is there ever a mention of the fact that the petitioner was told, advised, promised, or otherwise given the understanding that his sentencing guideline range would be 36 to 47 month.

307.9 grams which included the crack at issue in Count Two of the Indictment as well as the relevant conduct to which the petitioner stipulated in the plea agreement.  PSR at ¶14;  Plea Agreement at 7.)    The PSR then adjusted the base offense level downward by 2-points under § 2D(b)(6) and § 5C1.2 of the Sentencing Guidelines.  PSR at ¶15.  Finally, the PSR recommended a downward adjustment of 3-points for Acceptance of Responsibility under §§ 3E1.1(a) and 3E1.1(b)(1) and (b)(2).  PSR at ¶20.

The Presentence Report identified no departure issues applicable to the petitioner and his case.  PSR at ¶45.

### D.  The Sentencing Hearing

On October 23, 2003, the petitioner appeared before this Court for sentencing.  The Court sentenced the petitioner to a term of incarceration at the bottom of the applicable sentencing guideline range, that is to 87 months of imprisonment, to be followed by four years of supervised release.  Tr. 10/23/03 at 10 - 11.  Prior to doing so, however, the Court again inquired of the court interpreter's qualifications and ability to communicate with the petitioner, stated for the record the materials it had reviewed in anticipation of imposing sentence, and established that the petitioner's retained counsel and the petitioner had received and reviewed both the PSR and the addendum to the PSR.  Id. at 3 -4.

The Court then determined that neither side had any objections to the PSR prepared by the Probation Office, reiterated that the maximum possible sentence in the matter was "up to 40 years in prison, with a mandatory minimum of five years . . .," and established that neither party disagreed with the Court's statement of the maximum possible sentence.  Id. at 5.  Further, the Court made certain that there were no claims that the guidelines calculation as set forth in the PSR were inaccurate in any way, and specifically reviewed the manner in which the range of 87 -

108 months had been calculated. Again no objection was raised by either side. Id. at 5 - 6.

Defense counsel then urged the Court to impose a sentence at the very bottom of the applicable guideline range given the petitioner's criminal record, his affirmative acceptance of responsibility, and the certainty of his being deported from the United States as the result of the narcotics conviction. Id. 7 - 8. When given the opportunity to make any statements he wished, the petitioner expressed his sorrow for what he had done and assured the Court he would not repeat the offense.[9] Id. at 9.

After noting that the offense of distributing crack cocaine carries a very high guideline range, the Court stated that, because the petitioner would be deported, it did not find it appropriate to sentence the petitioner to a period of incarceration any longer than necessary. Accordingly, the petitioner was sentenced to the bottom of the guideline range, 87 months, to be followed by four years of supervised release. Id. at 10 - 11. As requested by the petitioner's counsel, the Court recommended that the petitioner receive appropriate substance abuse treatment while incarcerated and that he be housed as close to Massachusetts as was consistent with his security classification. Id. at 11 - 12.

The petitioner was then advised of his right to appeal, the 10 day limit for filing a Notice of Appeal, and the fact that if he failed to file an appeal within the ten day time period he would lose his right to appeal. The petitioner, who never voiced any objection to the sentence imposed or the manner in which the sentencing range was calculated, affirmed that he understood the time limit imposed on his right to appeal. Id. at 12 -13. Further, he was advised and stated that he

---

[9] At no point in the sentencing proceeding did the petitioner make any mention of his having been told he would be sentenced to a period of incarceration in the range of 36 to 47 months. This failure to make such a claim includes the portion of the proceedings immediately following his retained counsel's request for a sentence at the bottom of the applicable range as well as when the Court afforded him the opportunity to say whatever he might want to say.

understood that he had a right to have counsel appointed for him if he wanted to appeal but could not afford an attorney. Id. at 13.

Consistent with its promise contained in the plea agreement it entered into with the petitioner and his counsel, the Government filed a written motion to dismiss Counts One, Three and Four of the Indictment.  The Court immediately granted the motion.  Id.

When the parties indicated to the Court that there were no other matters to be taken up in connection with the case, the Court adjourned the proceedings.  Id. at 13 - 14.

At no time following imposition of sentence did the petitioner seek the appointment of counsel.  Further, no direct appeal challenging the sentence of 87 months was taken by the petitioner.   (Record).

## DISCUSSION

The analysis of a petitioner's motion filed pursuant to Title 28, United States Code, Section 2255 must necessarily begin by referring to that statute and the legal principles which govern its application.  Title 28 U.S.C. §2255 provides in relevant part that,

> A prisoner in custody under sentence of a court . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Section 2255, therefore, is a statutory mechanism for federal prisoners to challenge the validity of their sentences.  It authorizes a federal prisoner to challenge his sentence on four grounds: (1) the sentence was imposed in violation of the Constitution or federal law; (2) the court lacked jurisdiction to impose the sentence; (3) the sentence exceeded the maximum authorized by law; and (4) the sentence is otherwise subject to collateral attack.  Hill v. United

States, 368 U.S. 424, 426-27 (1962).  Section 2255, however, does not provide a remedy of "all claimed error in conviction or sentencing," United States v. Addonizio, 442 U.S. 178, 184 (1979), but rather is intended to redress only "fundamental defects" which result in a miscarriage of justice and "omission[s] inconsistent with the rudimentary demands of fair procedure." Hill v. United States 368 U.S. at 426.

Here the petitioner claims that the representation he received from Attorney Matthew Smith was constitutionally deficient in that counsel led the petitioner to believe that his federal sentence would be within the guideline range of 36 to 47 months.  Petition at 8, 9, 10, 11.  An allegation which is specifically denied by Attorney Smith.[10]  The petitioner also claims that he was never told that the total quantity of cocaine base reflected in the Stipulation of Offense Conduct, Plea Agreement at 7, would be used as the basis for calculating his applicable guideline range.  A claim which also is expressly denied by Attorney Smith.  Finally, the petitioner alleges that his counsel improperly failed to file a direct appeal challenging the sentence imposed by the Court.  Again, a claim denied by his retained counsel.  Notably, however, the petitioner has not moved to withdraw his guilty plea, nor does he ever assert that but for the alleged ineffective representation he received he would not have pleaded guilty to Count Two of the Indictment.[11] It is respectfully submitted that, for the reasons set forth hereinafter, the petitioner's claims of

---

[10] Exhibit D attached hereto is the affidavit of Attorney Matthew B. Smith relating to the petitioner's various claims.  The affidavit is referred to herein as "Atty. Smith Aff. at __."

[11] Petitioner's decision not to move to withdraw his guilty plea is, of course, a rational one since if he were permitted to do so, he would be faced with prosecution on not just Count Two, but Counts One through Four.  Counts One, Three and Four each carry mandatory minimum sentences of 10 years imprisonment.  Given the strength of the Government's evidence, namely hand-to-hand, recorded purchases of cocaine base from the petitioner and his co-defendant, the petitioner instead seeks an unavailable remedy.  Specifically, petitioner seeks the imposition of a sentence which is outside the sentencing guidelines and for which there is no legal justification.

ineffective assistance of counsel are without merit and his motion should be denied.

### General Legal Standards to be Applied

In order to obtain collateral relief under 28 U.S.C. § 2255, the petitioner must show that his "sentence was imposed in violation of the Constitution or laws of the United States." Indeed, *habeas corpus* relief is an extraordinary remedy and should only be granted where it is necessary to redress errors which, were they left intact, would "inherently result in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962). The strictness of this standard embodies the recognition that collateral attack upon criminal convictions is "in tension with society's strong interest in [their] finality." Ciak v. United States, 59 F.3d 296, 301 (2d Cir. 1995). See also Strickland v. Washington, 466 U.S. 668, 693-94 (1983) (recognizing the "profound importance of finality in criminal proceedings").

The Government respectfully notes that when evaluating claims that a convicted criminal was deprived effective assistance of counsel, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, and a defendant's *post hoc* accusations alone are not sufficient to overcome this strong presumption. To act otherwise would lead to constant litigation by dissatisfied criminal defendants and harm the effectiveness, and potentially even the availability, of defense counsel. See Id.; See also Korenfeld v. United States, 451 F.2d 770, 775 (2d Cir. 1971), cert. denied, 406 U.S. 975 (1972) (holding that unsupported allegations by habeas petitioners are insufficient to support collateral relief). In light of the presumption in favor of counsel, the threshold for an ineffectiveness claim is extremely high, and courts have "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox, or downright ill-advised." Tippens v. Walker, 77 F.3d 682, 686 (2d Cir. 1996).

-16-

### Specific Standards of Review Regarding Claim
### of Ineffective Assistance of Counsel

To prove a violation of his Sixth Amendment right to counsel based on his counsel's alleged ineffectiveness, the petitioner "must meet a difficult two-part test." DeLuca v. Lord, 77 F.3d 578, 584 (2d Cir.), cert. denied, 519 U.S. 824 (1996). He must establish both "(1) that counsel's performance fell below an objective standard of reasonableness, ... and (2) that there is a reasonable probability that, but for the deficiency, the outcome of the proceeding would have been different." McKee v. United States, 167 F.3d 103, 106 (2d Cir. 1999) (quoting Strickland, 466 U.S. at 688, 694). The ultimate goal of the inquiry is not to second-guess decisions made by defense counsel; it is to ensure that the judicial proceeding is still worthy of confidence despite any potential imperfections, as "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." Roe v. Flores-Ortega, 528 U.S. 470, 482 (2000) (quoting United States v. Cronic, 466 U.S. 648, 658 (1984)).

In assessing the reasonableness of counsel's performance "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Showing merely that there were potential strategic errors or that some decisions were questionable is not sufficient as "[t]here are countless ways to provide effective assistance in any given case." Id. In order to prevail on the first prong of the Strickland test, therefore, the petitioner must conclusively show that, despite the strong presumption in favor of counsel, "under the totality of the circumstances, [Attorney Smith] failed to exercise the skills and diligence that a reasonably competent attorney would provide under similar

circumstances." Boria v. Keane, 99 F.3d 492, 496 (2d Cir. 1996).

In addition, any inquiry into the objective reasonableness of counsel's actions is to be guided by "[p]revailing norms of practice as reflected in American Bar Association standards." Strickland, 466 U.S. at 688. With respect to guilty pleas, the Second Circuit has held that the ABA guidelines simply require "a defense lawyer in a criminal case...to advise his client fully on whether a particular plea to a charge appears to be desirable." Boria, 99 F.3d at 496 (quoting ABA Model Code of Prof. Resp., Ethical Consideration 7-7 (1992)); Purdy v. United States, 208 F.3d 41, 44 (2d Cir. 2000) (when advising a client regarding a guilty plea "counsel must communicate to the defendant the terms of the plea offer...and should usually inform the defendant of the strengths and weaknesses of the case against him"). Thus, while counsel is required to provide his client with an informed opinion on the merits of an offered plea, the "decision must ultimately be left to the client's wishes." Boria, 99 F.3d at 497.

In the Second Circuit,[12] the showing a petitioner must make to obtain collateral relief based on an improper calculation of his sentence is essentially the same as that required to obtain relief from a guilty plea. Cf. United States v. Gordon, 156 F.3d 376, 379-82 (2d Cir. 1998) (applying the Strickland standard to claim that counsel was greatly erroneous in estimating potential sentencing exposure). Thus, in order to prevail on his claim, the petitioner Mendez must show that his counsel's performance fell below an objective standard of reasonableness and resulted in substantial prejudice to him.

---

[12] The Supreme Court has not yet ruled on the question of how to treat claims of ineffective assistance of counsel as they relate to sentencing in non-capital cases. See Caspari v. Bohlen, 510 U.S. 383, 393 (1994) (noting that Strickland left the question of counsel's role in non-capital sentencing open).

**The Petitioner Has Failed to Demonstrate that Counsel's**
**Performance Fell Below an Objective Standard of Reasonableness**

In the instant case there is no question but that Attorney Smith fully and professionally discharged his duties as appointed counsel in this case. Attorney Smith provided the petitioner with copies of the indictment and plea agreement letter. Tr. 2/20/03 at 9, 10. He met personally with the petitioner numerous times, discussed the strengths of the Government's case against him, and reviewed the terms of the proposed plea agreement with him. Attorney Smith (and the Court) also advised the petitioner that the Government had made no promises as to what his sentence would be. See, generally, Tr. 2/20/03 at 7, 23-24; Atty. Smith Aff. at ¶¶ 7, 8, 9.. Consistent with the advice provided by Attorney Smith, the petitioner made an informed decision to plead guilty, one that was clearly the product of "strategic choices made after thorough investigation of law and facts relevant to plausible options [and is therefore] virtually unchallengeable." Strickland, 466 U.S. at 690.

While the petitioner asserts that he relied on Attorney Smith's ostensibly mistaken advice as to what his sentencing guideline range would be in deciding to plead guilty, the petitioner's claim that he was misled by his attorney regarding the consequences of his plea are not only directly contradicted by his counsel but are belied by his own remarks during the plea hearing. During the hearing, the petitioner stated, under oath, that he understood the charges against him, that he had reviewed the plea agreement and stipulation of offense conduct with his attorney, that he understood the terms of the agreement, that he desired to plead guilty, that he understood both the mandatory minimum and maximum sentences that could be imposed, and that he understood how the sentencing guidelines applied to his case. Id. at 10, 11, 18-19, 23, 28-29, 34. The petitioner also stated that he had not received any promises, other than those in the plea

agreement letter itself, that had led him to plead guilty to the federal narcotics charge. As the

Supreme Court has recognized, this Court was entitled to rely on the petitioner's sworn

statements, made in open court, that he fully understood the consequences of his decision to

plead guilty. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) (a petitioner's sworn statements,

made in open court, that he understands the consequences of his decision to plead guilty,

combined with a written plea agreement, signed and read by the petitioner, create a "formidable

barrier" to collateral relief which cannot be overcome by a petitioner's unsupported allegations of

attorney incompetence). Accord United States v. Hernandez, 242 F.3d 110, 112 (2d Cir. 2001);

United States v. DeJesus, 219 F.3d 117, 121 (2d Cir.); cert. denied, 121 S.Ct. 502 (2000).

      Nor is there any indication in the record to support the petitioner's belated assertion that

he was confused by the terms of the plea agreement itself. Petition at 11. The agreement, which

the petitioner acknowledged he had had read to him, and which he signed, explicitly set forth the

term of imprisonment to which he was exposed, namely a mandatory minimum of 5 years and up

to 40 years in prison. There are no provisions in the plea agreement which even remotely suggest

that his federal sentence would fall within the guideline range to which he makes reference in his

petition, that is 36 to 47 months.[13] The petitioner's failure to object to the supposed inadequacies

of his attorney's legal advice until nearly nine months after the entry of judgement against him

casts further doubt upon his version of events.

      Petitioner, however, makes a number of unsupported and uncorroborated claims

regarding the performance of defense counsel. These claims include the suggestion that because

---

[13] To the contrary, as attested to by Attorney Smith, the petitioner was told expressly that the guideline range would be based on the total quantity fo 307.9 grams of cocaine base which counsel estimated would place the petitioner at an adjusted base offense level of between 28 and 30. Atty. Smith Aff. at ¶¶ 8, 12.

Counts One, Three and Four were dismissed, counsel was ineffective for allowing the drug quantities in those counts to be used in calculating his guideline range. Petition at 8. The difficulty with petitioner's assertion is at least three-fold: <u>first</u>, petitioner stipulated to these quantities, Plea Agreement at 7, <u>see</u> <u>also</u> Tr. 2/20/03 at 23-34; <u>second</u>, the counts involved were not dismissed until *after* the Presentence Report had been prepared, the petitioner and his counsel had been offered the chance to address the Court during the sentencing hearing, and sentence had been imposed, Tr. 10/23/03 at 13; and <u>third</u>, the provisions of U.S.S.G. §1B1.3 (Relevant Conduct) obligated the Court to consider the quantities involved in those counts.

In addition, Attorney Smith discussed this specific subject matter with the petitioner before he entered his guilty plea. In fact, the petitioner had been advised about and voluntarily entered into the factual stipulation. <u>Id.</u> at ¶¶6, 7. Further, he was advised that his guideline range would be based on a controlled substance quantity of 307.9 grams. <u>Id.</u> at 7, 10.

Further, there is no doubt that Attorney Smith's decision not to object to the application of the relevant conduct provisions of U.S.S.G. § 1B1.3 constituted a strategic choice and, as such, is "virtually unchallengeable" under <u>Strickland</u>. <u>See</u> <u>Strickland</u>, 466 U.S. at 690. Any objection to the use of drug quantities in related counts of the Indictment to calculate petitioner's guidelines would have been frivolous and, more importantly, by pressing such a weak objection defense counsel could have potentially made it more difficult for petitioner to receive a sentence at the very bottom of his guideline range.[14] <u>See</u> Atty. Smith Aff. at ¶13.

Even if the Court disagrees with these conclusions, the assistance rendered by counsel was not constitutionally ineffective unless there is absolutely no strategic justification for the

---

[14] As clearly set forth in Application Note 3 to § 1B1.3, where a defendant is charged in multiple drug counts, the total quantity of drugs involved in the defendant's criminal conduct is to be used to calculate the offense level and not just the count of conviction.

actions taken. Cf. Kieser v. State, 56 F.3d 16, 18 (2d Cir. 1995) ("Actions or omissions by

counsel that might be considered sound trial strategy do not constitute ineffective assistance.").

Attorney Smith's decision not to object to the guideline range calculated by the Probation Officer

and contained in the Presentence Report was both strategic and professionally reasonable,

therefore, the petitioner has failed to satisfy his burden under the first prong of Strickland.

     The petitioner also alleges that Attorney Smith was derelict in his representation because

he failed to file a direct appeal of the sentence or seek a writ of certiorari.  Petition at 9.

The Supreme Court has held that where defense counsel has consulted with his client regarding

whether to appeal, it is clear that "[c]ounsel performs in a professionally unreasonable manner

only by failing to follow the defendant's express instructions with respect to an appeal."  Roe v.

Flores-Ortega, 528 U.S. at 478; Morales v. United States, 143 F.3d 94, 97 (2d Cir. 1998)

(holding that counsel has no duty to file appeal absent direct request). It is clear that Attorney

Smith met that standard in this case, as his affidavit shows that he carefully discussed the

possibility of appeal with the petitioner and that the petitioner instructed him not to file an appeal

after being informed of the strengths and weaknesses of his case.  See Atty. smith Aff. at ¶ 11.

The petitioner made the decision not to take an appeal, and he cannot now attempt to place the

blame on his counsel for his own decision not to do so.  As the Supreme Court has held, "a

defendant who explicitly tells his attorney *not* to file an appeal plainly cannot later complain that,

by following his instructions, his counsel performed deficiently.(emphasis supplied)" Roe, 528

U.S. at 477.

     The Government respectfully submits that the petitioner's unsupported contention that he

instructed Attorney Smith to file an appeal, and that Attorney Smith then failed to follow his

instructions, is further belied by the petitioner's actions.  The petitioner was well aware of his

right to appeal; he discussed it with his counsel, it was addressed in his plea agreement letter, and it was discussed by the Court during both the plea colloquy and the sentencing hearing.  Plea Agreement at 4; Tr. 2/20/03 at 14, 15: Tr. 10/23/03 at 12-13.  Despite his awareness of his right to file an appeal of his sentence, prior to filing his § 2255 motion the petitioner never objected to his counsel's alleged failure to do so.  See, e.g., Slevin v. United States, 71 F. Supp.2d at 359 (noting that "petitioner's failure to raise his claims earlier renders his claim--though not procedurally barred--rather suspicious.").  Nor did he attempt to proceed *pro se* in the appellate court, as he is doing here.  Cf. Blessing v. United States, 75 F. Supp.2d 17, 19 (D. Conn. 1999) (noting, in context of cause for procedural bar, that "there is no showing on this record that the petitioner could not have pursued an appeal *pro se*, as he is currently doing").

In light of the general suspicion cast upon uncorroborated allegations made by incarcerated prisoners, the petitioner's own actions, and the fact that his claims are expressly refuted by his counsel, combine to make the petitioner's version of events highly dubious.  See, e.g., Panuccio v. Kelly, 927 F.2d 106, 109 (2d Cir. 1991).  As a result, the Court should conclude that the petitioner's counsel satisfied the performance standard established in Roe and that petitioner's ineffective assistance claim must fail.

Similarly, petitioner's allegation that he received no benefit from the plea bargain, Petition at10, is manifestly untrue.  As with his earlier claim, this allegation is wrong for at least three obvious reasons.  First, as the result of the plea his counsel negotiated, petitioner received the benefit of having the Government recommend a three-level downward adjustment under U.S.S.G. § 3E1.1; second, also as a result of plea negotiations, the petitioner received a two-level downward adjustment under U.S.S.G. § 5C1.2(a) (the so-called "Safety Valve" provision) to

which petitioner arguably was not entitled,[15] see PER at ¶¶ 15, 25; and third, contrary to what petitioner asserts some nine months after sentence was imposed, he was not offered, nor on the facts of his case would he ever have been offered a negotiated plea which involved a drug quantity of just 9.9 grams of cocaine base.  Indeed, under applicable Second Circuit case law, the Government was prohibited from simply agreeing to a guilty plea to Count Two while ignoring the drug quantities involved in his other readily provable and relevant criminal conduct.  Cf. United States v. Telesco, 962 F.2d 165, 167-68 (2d Cir. 1992).[16]

Because the petitioner has failed to satisfy his burden of demonstrating that his attorney's actions were outside the "range of reasonable professional assistance," his request for collateral relief should be denied.[17]

### Petitioner Has Failed to Establish "Substantial Prejudice"

Even if the petitioner were able to make the difficult showing that his counsel's performance was objectively unreasonable and unprofessional, he still bears the burden of proving that the deficient performance "caused him substantial prejudice."  To demonstrate such prejudice the petitioner must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."  Hurel Guerrero v. United States, 186 F.3d 275, 282 (2d Cir. 1999) (quoting Strickland, 466 U.S. at 687-88).  More than just

---

[15] Petitioner claims at page 10 of his pro se submission that he did not receive a "safety valve" adjustment under § 5C1.2.  This is quite simply wrong.  See PER at ¶ 15.

[16] If petitioner had not received these adjustments, he of course would have faced a guideline range of 151 to 188 months based on a base offense level of 34 and criminal history category I. United States Sentencing Guidelines Sentencing Table.

[17] If the Court finds that the petitioner has failed to meet his burden on the issue of his attorney's performance, there is no need to continue with the prejudice analysis.  See Strickland, 466 U.S. at 697.  If the petitioner fails to meet his burden under either prong, his claim must fail.

simple speculation about potential harms caused by counsel's actions is necessary to support a finding of prejudice. For prejudice to exist, the established and unprofessional errors of counsel must have been "sufficient to undermine confidence in the outcome." Jackson v. Leonardo, 162 F.3d 81, 85 n.9 (2d Cir. 1998) (quoting Strickland, 466 U.S. at 694).   Here, the petitioner has failed to offer any objective evidence tending to show a reasonable probability that, but for counsel's unprofessional errors, the result of the plea and/or sentencing proceedings would have been different.

First, as noted above, during the plea hearing, the defendant was fully aware of the consequences of pleading guilty to the federal narcotics charge, and acknowledged that he had not received any promises beyond those contained in the Plea Agreement filed with the Court. Tr. 2/20/03 at 11; 15; 19-20;  23-24; 25; see generally Atty. Smith Aff. at ¶¶ 8, 12.

With  respect to the petitioner's complaint that his counsel failed to raise an objection to the calculation of his guideline range based, in part, on the "relevant conduct" contained in the Stipulation of Offense Conduct,  he has not demonstrated that such an objection would have altered the outcome of his sentencing.  That is, he has failed to establish that the guideline calculation was in fact erroneous and, as a consequence of such an error, he was prejudiced.  The petitioner provides no evidence to indicate that an objection would have altered the outcome of his sentencing as the objection he "contends should have been raised...[is] without merit and therefore would not have altered his sentence." United States v. O'Neil, 118 F.3d 65, 73 (2d Cir. 1997) (holding that failure to object, without merit, to presentence report is not prejudicial under Strickland analysis).  Attorney Smith's conclusion that any objection to the applicability of the "relevant conduct" would be without merit had ample support in the record.  Atty. Smith Aff. ¶¶10, 13.

Along these same lines, if the Court were to credit the petitioner's uncorroborated allegations and find that Attorney Smith's alleged failure to file a direct appeal was professionally deficient, in order "to meet the prejudice requirement for an alleged failure by counsel to file a direct appeal a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient...[performance] he would have timely appealed." Roe, 120 S. Ct. at 1037. The petitioner has not explicitly alleged that he would have filed a direct appeal but for the acts of his counsel. This failure alone is enough to warrant dismissal of his claim. Cf. Hill v. Lockhart, 474 U.S. at 60 (holding that finding of prejudice is precluded where the petitioner failed to allege that he would not have pled guilty had he been given correct information by counsel).

More importantly, in the present case, where any grounds for appeal would have been frivolous and the petitioner made no effort to file a direct appeal *pro se* or otherwise despite his explicit knowledge of his right to appeal, there is no reason to believe that the petitioner would, in fact, have filed a timely appeal had it not been for the actions of his counsel. See Roe at 1038, 1039; cf. Peguero v. United States, 526 U.S. 23, 119 S. Ct. 961, 964-65 (1999) (holding that finding of prejudice based on trial court's failure to inform petitioner of right to appeal is precluded where petitioner was already aware of right). To the contrary, all indications are that his unsupported *post hoc* claims are nothing more than an attempt to obtain collateral relief after having made an informed decision not to file a direct appeal. Cf. Bousley v. United States, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal"). See Atty. smith Aff. at ¶11.

Accordingly, the Court should find that the petitioner has not borne his burden on either prong of the Strickland test and that his claims of ineffective assistance of counsel must therefore

fail.  Further, the Court should find that the specific performance the petitioner apparently seeks in this matter is simply not available.[18]  Petition at 13.   The Government never agreed to a disposition which limited the drug quantity at issue to only 9.9 grams of crack, and the Court should hold that it is not in a position to order the "specific performance" being sought by the petitioner.


# CONCLUSION

For all of the reasons set forth herein, the petitioner's motion to vacate, set aside and correct his sentence should be denied.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


JOHN H. DURHAM
DEPUTY UNITED STATES ATTORNEY
157 Church Street, 23rd Floor
New Haven, CT 06510
Telephone No. (203) 821-3817
Federal Bar No. CT05087

---

[18] Again, because page 12 of his motion was not filed with the Clerk of Court, the Government has to speculate as to the precise basis advanced for the relief he is seeking.

<u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing memorandum was mailed this  day of

March 2005, to:

> Jose Anibal Mendez
> Prisoner No. 14877-014
> F.C.I. Fort Dix
> P.O. Box 38
> Fort Dix, NJ 08640

_____

JOHN H. DURHAM
DEPUTY UNITED STATES ATTORNEY