IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
New Haven Division

JOSE ANIBAL MENDEZ,
        Petitioner

v.                              3:04-CV-1228 (SRU)

UNITED STATES OF AMERICA,
        Respondent

## MOTION TO AMEND § 2255 MOTION

The Petitioner, Jose Anibal Mendez, Pro Se, respectfully
moves to amend the currently pending § 2255 Application for good
cause.  It is the Petitioner's position that the argument now
presented is made possible by the Second Circuit Court of Appeals
decision in United States v. Gonzalez, 420 F.3d 111, 129 (2nd Cir.
2005), which has the force of an en banc opinion de facto and
holds that drug quantity and drug identity are elements of the
Controlled Substance Act offenses of conviction pursuant to 21
U.S.C. § 841(b).

Mr. Mendez' codefendant, Manuel Polanco, submitted this argu-
ment in an earlier version before the Second Circuit had decided
Gonzalez.  Upon information and belief, Mr. Polanco's § 2255 Peti-
tion is still pending, although he has personally been transferred
from F.C.I. Fort Dix East and is no longer in touch.  Mr. Mendez
will next deonstrate that the argument presented here relates back
to his argument that his sentence was constrained by the terms of
his indictment and his guilty plea, just as Mr. Polanco argued.

He argues _infra_ that the attached amendment relates back to the original argument and is cognizable pursuant to F.R.Cv.P. 15 (c)

A.   Standard And Appropriateness:

The Petitioner is well beyond the one year allowed by the A.E.D.P.A. for raising original arguments.[1] United States v. Thomas, 221 F.3d 430, 435-6 (3rd Cir. 2000) (amendment must relate back to arguments made on date when petition was filed and not add new claims). Otherwise, certification that the argument does relate back is established to the same standards as for civil litigation. Fama v. Commission of Correctional Services, 235 F.3d 804, 814  (2nd Cir. 2000).

Allowance of amendment is equitably required when the added argument only strengthens the existing argument and does not arise from conditions that substantively prejudice the Government's ability to defend.  Pruit v. United States, 274 F.3d 1315 (11th Cir. 2001) (pure argument in law cannot prejudice the Government).  Even if new evidence is raised, references in the original submission (e.g., suspicions not sufficiently supported to be actionable) have been held sufficient to put the Government on notice of its potential need to defend in the future.  Mandacina v. United States, 328 F.3d 995 (8th Cir.) reh. and reh en banc denied, 2003 U.S. App. LEXIS 14614 (2003).

---

[1] This amendment presents an issue of first impression for this court to rule whether the A.E.D.P.A. time limit can prohibit a jurisdictional argument.

The standards set, Mr. Mendez discusses his specific basis for Rule 15(c) relation back.

B.  Discussion:

Amendment is allowed because the Gonzalez decision relates back to Mr. Mendez' first ground for relief, namely that his conviction liability had to be limited to the terms of his indictment and his plea.  Specifically, Argument I supports that thesis by demonstrating the substantive effect of the Booker Constitutional decision in different terms than the demonstration in United States v. Gonzalez.

The Government will doubtless seek to argue that the Booker Remedial Decision, supposedly implementing the original intent of Congress, eclipses the relief to which the Petitioner believes he is entitled.  The Petitioner's argument, rather, shows that the situation is the other way around.  But even were this not the case, where the Sentencing Guidelines were always facially constitutional to the Sixth Amendment if applied with the beyond a reasonable doubt standard of proof, the Booker Remedial Decision is demonstrably ex post facto.  Argument II

For the sake of completeness Argument I addresses the limitation of indictment restriction to sentencing and the requirement of proof of mens rea for drug identity and drug quantity.  The Government absolutely does not have the Defendant's admission to knowledge of the additional drug quantities for which he was sentenced.

Finally, the Petitioner admits that the third argument he presents may be beyond the scope of his original § 2255.  However, the two issues described involving the scheduling of crack cocaine

are jurisdictional in character.  Croussett v. United States, C.A.
No. 97-1729 (3rd Cir. 1997) (unpublished opinion declaring scheduling issue jurisdictional, for which no showing of cause and prejudice is required;  but holding that crack finding is only a sentencing factor, not essential for guilt to the offense of conviction and only reliant to sentencing).

The reasoning of United States v. Gonzalez, of course, deprives the Croussett decision of legitimate basis for denial and leaves the jurisdictional basis for the argument more intact than ever.  Because jurisdiction is an issue raisable at any time, e.g., Wyoming v. Oklahoma, 502 U.S. 437 [1992] (whenever a jurisdictional challenge is raised, jurisdiction must be proved), Mr. Mendez believes the argument can be validly made at this time.

I.      THE UNITED STATES v. BOOKER CONSTITUTIONAL DECISION
        REQUIRES THAT DRUG IDENTITY NOT BE MERELY SOME FACT
        OF EVIDENCE, BUT AN ELEMENT-FACT REQUIRED  FOR  THE
        SPECIFIC CONVICTION:

     The proof of facts beyond a reasonable doubt that are elements

of a criminal conviction receive structural procedural protection.

Trial is

            "the prime instrument for reducing the risk of
            convictions  resting  on  factual  error.   The
            [trial] standard provides concrete substance
            for the presumption of innocence - that 'bed-
            rock and elementary' principle whose 'enforce-
            ment lies at the foundation of the administra-
            tion of justice.'"

In re Matter of Winship, 397 U.S. 358, 364 [1970].  The defendant

is protected authomatically by the structural requirements of the

trial proceeding.

            "The prosecution's burden of proof to the jury
            of every element beyond a reasonable doubt is
            not lifted by a defendant's tactical decision
            not to contest an element of the offense."

Estelle v. McGuire, 502 U.S. 62, 72 [1991] (emphasis added).  The

Supreme  Court  decisions  in  Apprendi v. New Jersey, 530 U.S. 466

[2000], Blakely v. Washington, 124 S.Ct. 2531 [2004], and United

States v. Booker, 125 S.Ct. 738 [2005], have unequivocally identi-

fied categories of facts that were being treated only as "sentenc-

ing factors" to be "elements."  For this clarification, there are

substantive consequences.  Richardson v. United States, 526 U.S.

813, 817-18 [1998] (facts identified as elements receive the full

panalopy of constitutional protections).  In fact, it seems only to

be an academic exercise for the Supreme Court to pronounce the

nature of the protections clarified in <u>Blakely</u> <u>v.</u> <u>Washington</u> to be structural.    <u>Washington</u> <u>v.</u> <u>Recuenco</u>, S.Ct. 05-0083 (October 17, 2005, certiorari granted on question whether trial court permitted to infer basis for jury verdict without having express verdict).

Amendment must be allowed on two jurisdictional issues, ending a substantive inequity in the administration of Controlled Sub-stance Act.    First, recognition of drug identity/drug quantity as elements of distinct 21 U.S.C. § 841(b) offenses, <u>United</u> <u>States</u> <u>v.</u> <u>Gonzalez</u>, 420 F.3d 111, 129 (2nd Cir. 2005) and <u>United</u> <u>States</u> <u>v.</u> <u>Malouf</u>, 377 F.Supp.2d 315, 328 (D. Mass. 2005), imputes a schedul-ing requirement for crack cocaine as its own controlled substance; second, the sentence to Mr. Mendez' conviction is, as he has extensively argued, limited to the terms of his guilty plea.

     A.   The <u>Booker</u> Constitutional Decision Is Not Based On <u>Any</u> <u>Labels,</u> But On Those Facts Which Legally Authorize The Sentence <u>Per</u> <u>Se</u>:

A deprivation of a constitutional right is, by definition, a miscarriage of justice.    The Supreme Court has held that the impo-sition of any unwarranted term of imprisonment is "constitutionally significant."    <u>Glover</u> <u>v.</u> <u>United</u> <u>States</u>, 531 U.S. 198, 202 [2001]. Thus, Mr. Mendez' "conviction" putatively must include a material element of the actual offense sentenced, i.e., crack cocaine, which is here shown to require scheduling to be a legitimate element, and the sentence is limited to that for the indictment remaining after Mr. Mendez' guilty plea.    Under either prejudice, the error to Mr. Mendez' sentence must be addressed.

What has been overlooked thus far in deciding post-<u>Booker</u> cases like <u>United</u> <u>States</u> <u>v.</u> <u>Antonalopoulos</u>, 399 F.3d 68, 74 (1st

Cir. 2005) to United States v. Rodriguez, 398 F.3d 1291, 1393 (11th Cir. 2005), is the subtle, but critical, change in language between the Supreme Court's holding in Apprendi v. New Jersey and its Blakely and Booker holdings. The controversy presented in Apprendi constrained the Supreme Court to the Due Process and Jury protections owed in a purely statutory question; the Blakely and Booker decisions operate on the subject-matter of the sentence maximum to be imposed after all constitutional, statutory, and equitable considerations.

When the actual holding of United States v. Booker is analyzed, it is determined to be operating on all sentencing maxima in general, without regard to labels of "statutory maximum" or "guideline maximum." This recognition renders the Circuit Courts' post-Booker approach and their adoption of the legislated statutory maximum as the sentence authorized by any conviction for the offense a nullity and void.

In Apprendi v. New Jersey, 530 U.S. 466, 490 [2000], the Supreme Court held that

> "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

The Court ruled to the limit of the subject matter jurisdiction conferred by that controversy.

The principle which decided Apprendi, however, was revisited in the context of the Washington State sentencing guideline scheme. In the Blakely v. Washington decision, the Court clarified that

3

> "the 'statutory maximum' for Apprendi purposes
> is the maximum sentence a judge may impose sole-
> ly on the basis of facts reflected in the jury
> verdict or admitted by the defendant.
>
> "In other words, the relevant 'statutory maxi-
> mum' is not the maximum sentence a judge may
> impose after finding additional facts, but the
> maximum he may impose without any additional
> findings.

Blakely v. Washington, 124 S.Ct. 2531, 2537 [2004] (emphasis added).

The Washington State Supreme Court had originally interpreted the Apprendi holding as espousing the principle that the "statutory maximum" was the "absolute maximum sentence provided by the legislature for a certain offense, not the maximum sentence allowed by the jury's findings." Washington v. Gore, 21 P.3d 262 (2001), cited in Washington v. Hughes, 110 P).3d 192 (2005). In Hughes, the Washington Supreme Court corrected itself and conform- ed its holding to Blakely that the "statutory maximum" is in fact the "maximum sentence a judge may impose solely on the basis of the facts relected in the jury verdict or admitted by the defendant." Ibid.

The disentanglement of the Blakely "sentencing maximum" holding from the labels attached to statutory and guideline maximums was absolutely affirmed by the Supreme Court's rejection of Washington State's defense in Blakely that the Apprendi principle did not apply because the Washington State Sentencing Guidelines were only discretionary, not mandatory law. Please see the exerpt of Blakely Reply Brief addressing this precise issue, appended as Appendix B, and affirmed in Blakely v. Washington, 159

4

L.Ed.2d 403, 415 n. 8 [2004].

The Supreme Court distanced its constitutional holding from labels still further in deciding United States v. Booker. It dispensed from using the "statutory" label at all and made the word "maximum" the full noun-object of the holding.

> "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."

Booker, 125 S.Ct. at 756.

The Booker holding does not place any temporal restrictions on when the legally sufficient facts to support an ultimate sentence must be adduced, but it places constitutional conditions on the quality of those facts. And it establishes that it is the facts which authorize a sentence as constitutionally sound and legally correct, not that the legislated statutory maximum named in the indictment "authorizes" any sentence less than or equal to it!! This requirement for proof of facts is the hallmark of a defendant having structural substantive protections of charging and standard of proof of the first magnitude. In re Winship, supra.

What has been overlooked in post-Booker jurisprudence across the Circuits is that the Booker Constitutional Decision has finessed the Booker Remedial Decision into being irrelevant to the Constitutional question decided, i.e., what actual sentence is authorized by what facts. Making the Guidelines non-mandatory is irrelevant. And the question whether an error is "plain" or "harmless" is, to the Petitioner's understanding, res judicata. It

is neither because it is structural and substantive.

The Federal Sentencing Guidelines were always constitutionally sound law, even if they were not what Congress is said to have intended. See Booker Remedial Decision analysis in light of ex post facto discussion, infra. And all pre-Booker Guideline sentences were in fact "statutory" sentences. United States v. R.L.C., 503 U.S. 291, 298 [1992] (Sentencing Guidelines are statutory because the requirement to use the Guidelines is both statutory and mandatory).

Any change in factfinder from jury to judge is a substantive, structural change in Constitutional protection. Hicks v. Oklahoma, 447 U.S. 343 [1980] (irrelevant that defendant exposed only to same sentence liability; change in factfinder from jury to judge is inherent change in structure of the proceeding). And, if a fact is changed by interpretation from "mere evidence" to an "essential element" of the actual offense of conviction, that interpretation is substantive and retroactive. Bunkley v. Florida, 538 U.S. 835 [2003]. When this case is analyzed for whether crack cocaine was scheduled as a controlled substance element to the 21 U.S.C. § 841(b)(1)(A)(iii) offense and whether Mr. Valdez possessed the mens rea required for guilt, his conviction and sentence will have to be vacated. Accordingly, this certiorari asks for vacatur and remand.

B.   The Limitation Of Indictment Substantively Restricts
     The Jurisdiction Of The Court To Sentence:

"It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of substantive Due Process." Jackson v. Virginia, 443 U.S. 307, 314 [1979], citing Cole v. Arkansas, 333 U.S. 196, 201 [1948]. It is wrong, however,

to treat indictment protection _purely_ as a form of Due Process pro-
tection.  It is its own basis for protection by being jurisdiction-
al law directed at the power of Federal Government over the People.

> "Indictment is the mechanism upon which Federal
> criminal jurisdiction over the person is
> premised and is 'indispensible to the power of
> the Court.'"

Ex parte Bain, 121 U.S. 1, 12-13 [1887].  That the protection of
indictment is not identical with the protection of the Due Process
Clause is demonstrated by the fact that the indictment requirement
is not imposable on the States.  Hurtado v. California, 111 U.S.
516 [1884].  If grand jury protection were Due Procee notice
protection, as it is currently being treated (e.g., United States
v. Cotton, 534 U.S. 625 [2002]), the Fourteenth Amendment would
have demanded its imposition on the States.  Ibid.  Instead, grand
jury joins double jeopardy and ex post facto as being constitu-
tional law directed against the power of federal government over
the people.

When an indictment fails to allege each material element of
the offense "wanted," it deprives the District Court of jurisdic-
tion over that offense.  United States v. Morrison, 529 U.S. 598
[2000].  It is unconstitutional for Government or the District
Court to enlarge the mandate of an indictment without that enlarg-
ing amendment being the further deliberation of a grand jury.
United States v. Miller, 471 U.S. 130, 142-44 [1985].  The un-
American practice that any criminal charging is de facto open ended
to receive any other criminal conduct at sentencing, Cotton, supra
(allowing harmless error analysis), can no longer be sustained post

7

the _Booker_ Constitutional Decision.

As a further consequence, admissions under "a plea of guilty [are] constitutionally valid _only_ _to_ _the_ _extent_ that the plea is 'voluntary' and 'intelligent'" to the proper application of the indictment charging _and_ the _United_ _States_ v. _Booker_ Constitutional holding. _Bousley_ v. _United_ _States_, 523 U.S. 614, 618 [1998]. That the defendant put up no defense to an element at trial or otherwise is no legal concession of the Government's burden of proof. _Estelle_ v. _McGuire_, _supra_ at 72.

Thus, the limitations of indictment and verdict and/or guilty plea stand as independent obstacles to further sentencing a defendant beyond the minimum constitutional conviction. The Constitution only allows a defendant to be sentenced _up_ _to_ the limit supported by the facts charged and proven beyond a reasonable doubt. _Williams_ v. _New_ _York_, 337 U.S. 291 [1949], was in effect superceded by the changed sentencing milieu brought about by the Sentencing Guidelines. The Due Process recognitions to constitutional sentencing begun in _Townsend_ v. _Burke_, 334 U.S. 736 [1948], and further generalized in _Gardner_ v. _Florida_, 430 U.S. 349 [1991] (defendant possesses some Due Process protection at sentencing), have now reached the realities of a modern criminal prosecution.

B.  Drug Identity And Drug Quantity As Elements Require
    A _Mens_ _Rea_ Element To The Charged Drug Offense:

The original enactment of the Controlled Substances Act was arguably a public welfare law establishing four public welfare offenses, one for each Schedule. _United_ _States_ v. _Balint_ [1922] (holding opiate offense to be public welfare). By the logic of public welfare offenses, a prosecution was permitted for any

quantity sufficiently measurable to be proved for its presence beyond a reasonable doubt.  E.g., United States v. Sudduth, 458 F.2d 1222, 1224 (10th Cir. 1972) ("The quantity or harmfulness of the thing involved is of no consequence.  A conviction will be upheld wherever a measurable amount is found."); United States v. McHugh, 769 F.2d 860, 868 (1st Cir. 1985) ("neither § 841(a) nor § 846 require any specific quantity for conviction").  Public welfare offenses, of course, may be prosecuted for mere negligence; no mens rea is required as an element towards guilt.  Liparota v. United States, 471 U.S. 419,   [1985].

If legitimately a public welfare offense, such a crime must be arrested and prosecuted as soon as it is detected.  Since at least the 1984 Amendment to the C.S.A., however, when penalty-determinative quantities were annexed to certain drugs, the law could no longer claim to be describing purely a public welfare offense.  But when defendants attempted to argue contrary to public welfare, all arguments were rebuffed with the explanation that any further description of offense past § 841(a) was only sentencing factors.  Now that position cannot be maintained in good faith.  United States v. Gonzalez, 420 F.3d at 129; United States v. Malouf, 377 F.Supp.2d 315, 328 (D. Mass. 2005).

With drug identity and quantity both elements to offenses greater than the threshold § 841(a)(1) offense, the "knowingly and intentionally" requirement of § 841(a) extends to those elements as well.  United States v. X-Citement Video, Inc., 513 U.S. 64, 79-80 [1994] (Stevens, J., concurring) (adverb "knowingly" placed at beginning of a statute applies to all the elements which follow in

the statute).    Absent a special reason otherwise, the proof of a guilty mens rea element is the normative requirement of all American jurisprudence.  United States v. United States Gypsum Co., 333 U.S. 364 [1948].

Mr. Mendez is entitled to make this claim of error because he was held criminally responsible for crack cocaine which had no statutory definition.  The prosecution presented no proof of his knowledge or intent to distribute "crack."  Therefore, this case presents a clear case for a directed verdict on the crack cocaine liability.

The Writ should be granted vacating the crack cocaine sentence and conviction and restrain the further prosecutions of Americans under the controlled Substances Act before another person is un-Americanly victimized by the application of a law lacking legitimate jurisdiction.

II.    THE DISTRICT COURT WAS CONSTRAINED TO APPLY THE UNITED
       STATES SENTENCING GUIDELINES TO THE STANDARD OF THE
       BOOKER CONSTITUTIONAL DECISION BY PRINCIPLES OF EX
       POST FACTO LIMITATION ON CHANGES TO THE LAW:

The Ex Post Facto Clause is a Constitutionally promulgated criminal law directed against the power of the Federal Government proscribing the enforcement of criminal statutes having a punitive effect on a citizen, directly or indirectly, for events completed before the statute became law.  Ex post facto analysis does not turn on the identification of equity in a case; when the defining conditions exist, enforcement must be absolute.  More than any other constitutional provision in practice, the Ex Post Facto Clause affirms the ascendency of the Citizen over Government and tests the honesty of Government to its founding principles.

A.    Basic Tenets Of Ex Post Facto:

The gravitas of ex post facto is such that James Madison was prompted to remark that "ex post facto laws . . are contrary to the first principles of the social compact and to every principle of sound legislation."  The Federalist, No. 44, p. 282 (C. Rossiter, ed. 1961)  Alexander Hamilton described the ex post facto prohibition as among the three protections "greater to liberty and republicanism than any [others the Constitution] contains."  The Federalist, No. 84, p. 511 (C. Rossiter, ed. 1961).  Modern commentary is no less deferential.

> The prohibition "is deeply rooted in our
> jurisprudence, and embodies a legal doctrine
> centuries older than our Republic."

Landgraf v. U.S.I. Film Products, 511 U.S. 244, 265 [1994].

11

Four basic categories of ex post facto prohibition on government were enumerated over two hundred years ago by Justice Chase in <u>Calder</u> v. <u>Bull</u>, 3 U.S. 386, 390 [1798], and, spanning the ambit of observed situations, still serve as the paradigm of ex post facto meaning:

1) <u>Every</u> <u>law</u> that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action;

2) <u>Every</u> <u>law</u> that aggravates a crime, or makes it greater than it was when committed;

3) <u>Every</u> <u>law</u> that changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed; and

4) <u>Every</u> <u>law</u> that alters the legal rules of evidence, <u>and</u> <u>receives</u> <u>less</u>, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender [and thus authorize the potential greater penalty annexed to the unlawful conduct or status].

<u>Ibid</u>. (emphasis added). Later pronouncements of the Supreme Court give more succinct expression. <u>Fletcher</u> <u>v.</u> <u>Peck</u>, 10 U.S. 87, 138 [1810] ("An ex post facto law is one which renders an act punishable in a manner in which it was not punishable when it was committed."). Also see <u>Cummings</u> <u>v.</u> <u>Missouri</u>, 71 U.S. (4 Wall) 277, 328 [1867], and <u>Malloy</u> <u>v.</u> <u>South</u> <u>Carolina</u>, 237 U.S. 180, 184 [1915].

"The [ex post facto] prohibition . . is an additional bulwark in favor of the personal security of the subject, to protect his or her person from punishment by legislative acts having retrospective operation. [    ]. The restriction not to pass any ex post facto law was to secure the person of the subject from injury, or punishment, in consequence of such law."

12

Calder, at 390. "The Constitution's prohibition and the judicial interpretation of it rest upon the notion that . . the criminal quality attributable to an act [i.e., conduct or status], either by the legal definition of the offense or by its nature or the amount of punishment imposed for its commission, should not be altered by legislative enactment, after the fact, to the disadvantage of the accused." Beazell v. Ohio, 269 U.S. 167, 170 [1925]. It is the person who is being Constitutionally protected by the definitions in place.

> "Through [the ex post facto] prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and Citizens can rely on their meaning until explicitly changed."

Weaver v. Graham, 480 U.S. 24, 28 [1981]; Dobbert v. Florida, 432 U.S. 282, 298 [1977]. When any ex post facto condition is created, "all these, and similar laws, are manifestly unjust and oppressive." Calder at 390 (emphasis added).

B. Regardless Of The Source Of Ex Post Facto Violation The Violation Is Per Se Offensive:

It was the comprehension of the Founders that the Judicial Branch of Government would only be jus direre to the meaning of the law and the Executive Branch would be jus implere to that meaning. To them, once "given," (jus dare), law itself had immutable meaning. Therefore, the ex post facto prohibition was only written into the legislative Articles. Rogers v. Tennessee, 532 U.S. 451, 475-77 [2004] (discussing legal principles accompanying drafting of Constitution).

13

But the importance of ex post facto was such that, in one of the most reflective documents ever drafted, the ex post facto prohibition is set down twice. Article I, § 9, cl. 3, and Article I, § 10, cl. 1.    It is therefore inconceivable that the Framers of the Constitution believed that the protection they had incorporated could be circumvented by achieving the offending result through the alternative of executive or judicial fiat.    Even when the modern Supreme Court has attempted to claim that the judicial ex post facto prohibition is not "jot for jot" to the Calder list, it must still acknowledge that "the limitations on ex post facto judicial decision making are inherent in the notion of Due Process."    Rogers v. Tennessee, 532 U.S. at 456.    In practice, this means that if a

> "legislature is barred by the Ex Post Facto Clause from passage of such a law, it must follow that [the] Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."

Bouie v. Columbia, 378 U.S. 347, 353-54 [1964]; also see Marks v. United States, 430 U.S. 188, 190-92 [1977] (case of a judicial interpretation expanding the scope of a statutory offense to include additional conduct not previously identified as criminal). The correct analysis of the Booker Remedial Decision is for how it would be treated if done by Congress.    Then, just as the right to appeal is not explicitly conferred, once the right was statutorily created, the Courts were obligated to enforce it in all its respects by the Due Process Clause.    Rodriquez v. United States, 395 U.S. 327 [1969].

14

Previously, the Courts have not been shy.  When the Executive Branch has broadened the scope of a penal regulation by administrative pronouncement, ex post facto has been universally enforced on the Executive by the Courts themselves.  E.g., Mersky v. United States, 361 U.S. 431, 455 [1960] (limiting scope of importation labeling regulation outright, but alternately would enforce ex post facto prohibition from prosecution).

Thus, whether the "label" given to the effective change was "interpretation" or anything else, the ex post facto analysis is always separately based on the actual effect of the change in the law.

C.   Procedural Changes Must Be Purely Procedural In Order Not To Be Subject To The Ex Post Facto Prohibition:

To the extent that incidental procedures are used to implement the law, that is not an ex post facto concern.  Beazell v. Ohio, supra; Dobbert v. Florida, supra (Ex Post Facto Clause has no application to changes which relate exclusively to a remedy or mode of procedure).

But when the remedy or procedures crosses into demonstrable effect on the substance of the governmental actions on the person, it becomes no longer "purely" procedural in character.[1]  The ex post facto "inhibition was leveled at the thing, not the name . . under any form, however disguised.  Cummings v. Missouri, 71 U.S. (4 Wall) 277, 328 [1867] (emphasis added).  Certain "procedural"

---

[1]  New procedural rules that benefit a defendant apply retroactively on direct appeal automatically.  Griffith v. Kentucky, 479 U.S. 314, 328 [1973].  It was once a Common Law practice to benefit all prisoners affected by a positive change in criminal law.

changes have historically occurred which were identified on review to increase the possible maximum punishment range that could be imposed for criminal acts or changed the ingredients of the offense, or the acts necessary to expose the accused to greater potential penalty. They have universally been recognized by their effect, and condemned.  E.g., Miller v. Florida, 482 U.S. 423 [1987].

> "[T]he Ex Post Facto Clause forbids the [gov-ernment] from enhancing the measure of punish-ment by altering the substantive 'formula' used to calculate the applicable sentencing range."

California Dept. of Corrections v. Morales, 514 U.S. 499, 508 [1995].

When the Sentencing Commission amended its own Guidelines, it distinguished regularly between amendments that were purely procedural and those that were substantive.  Those that were "clarifying" were fully retroactive for stating what the Guideline always meant.  U.S.S.G. § 1B1.11(b)(1).  On the other hand, those that were substantive were never retroactive if they disadvantaged the defendant.  See, for example, United States v. Kepp, 951 F.2d 521, 526 (3rd Cir. 1991) (noting that all Circuits enforce ex post facto prohibition on all prejudicial substantive Guideline amend-ments and collecting those cases).  The Booker Remedial Decision certainly qualifies as a substantive amendment.  Vide infra.

It cannot be left simply to someone's naming of the change as procedural (or today "remedial") to define what is legally occur-ring.  Collins v. Youngblood, 497 U.S. 37, 46 [1990], citing

Gibson v. Mississippi, 162 U.S. 565, 590 [1896].  Collins goes on to point out that

> "Subtle ex post facto violations are no more permissible than overt ones.  . . .  The Constitutional prohibition is addressed to laws, 'whatever their form,' which alter the nature of the offense, or increase the [authorized] punishment."

Collins, 497 U.S. at 46, quoting Beazell v. Ohio, 269 U.S. at 170 (emphasis added).  When arguments are made to the contrary of ex post facto, the fallacy is that the argument generally "fails to acknowledge that it is the effect, not the form, of the law that determines whether it is ex post facto."  Weaver v. Graham, 450 U.S. 24, 28 [1981].

The Collins Court held that "the prohibition which may not be evaded [by its non-legislative origin] is the one defined by the Calder categories."  Collins, 497 U.S. at 46.  Frankly, it is difficult to rationalize how judicial lawmaking could avoid any of the four "jots" of Calder without violating fundamental Due Process.

D.  The Booker Remedial Decision Is Ex Post Facto:

The Booker remedial Opinion purports to eliminate Guideline maximum sentences as any constitutionally-based limitation on the power of the courts to sentence for a conviction.  The unique subtlety disguising the ex post facto violation by this part of the Booker decision is that the change effected by the Opinion operates on the Sixth Amendment protections that had legally just been recognized by the Booker constitutional Opinion for having been erroneously denied to defendants for seventeen years!  The

17

fact that no defendant was ever constitutionally sentenced in seventeen years gives the entirely misleading impression that no rights are being violated by a Remedy Opinion that strips those rights, and the past can remain in repose. Per all the discussion above, however, this "appearance" can only be legally true if the Remedial change is demonstrated to be "purely procedural." Otherwise, seventeen years of criminal defendants are entitled to the substantive sentencing protection they were originally denied, nunc pro tunc.

The Relief Opinion also strips the preponderance of evidence protection that had been traditionally afforded all Guideline sentencings. While less than the sentencing protection identified as required by the Booker Constitutional Decision, the elimination of even preponderance protection effects a substantive change in law for defendants whose offense occurred prior to Booker.

In order to rationalize away ex post facto constraints, the Remedial majority portrayed its Opinion as purely an interpretation of Congressional intent in enacting the Sentencing Reform Act (i.e., "S.R.A.") of 1984.  Booker, 125 S.Ct. at 750.  If just a pure interpretation, the Supreme Court would be articulating what the S.R.A. always meant.  Rivers v. Roadway Express, 511 U.S. 298, 308 [1994].  If the true meaning of the law is therefore unchanged, just unrecognized, the logic goes, then the remedial Opinion has effected no change in entitled constitutional right and has no ex post facto problem.  By this logic, the past seventeen years of defendants received a windfall for having their sentences determined to a preponderance of the evidence standard, even    if

18

Congress' "mistake" actually required jury proof beyond a reason-
able doubt when the statutes were finally analyzed.

    While appealing in certain circles, this analysis is super-
ficial and wrong. First, its underlying proposition requires pure
interpretation.

> "This Court will not strive to correct legis-
> lative mistakes, but will follow the intention
> as expressed."

Barnity's v. Casey's Leasee, 7 Cranch 456, 3 L.Ed. 403, 410
[1803]. The Supreme Court Remedial Decision has not just inter-
preted the S.R.A. as written. It repeals 18 U.S.C. § 3553(b)(1)
and 18 U.S.C. § 3742()! Second, the Remedial Decision publishes
law that was never litigated. Instead of requesting further
briefing, the remedial majority adopted a solution patently pro-
Government that defendants can only challenge as fait accompli.
Mssrs. Booker and Fanfan were unconstitutionally left unequally
postured before the Court compared to the Government. James B.
Beam Distilling Co. v. Georgia, 501 U.S. 529 [1991] (holding that
Due Process requires that litigants be equally postured vis a vis
the forum). By its approach, the remedial majority deprived the
pro-petitioner side of notice. And, third, the remedial mechanism
employed by the Breyer majority, i.e., judicial repeal of facially
valid statutes, is so substantive per se as to command ex post
facto restraint. The only basis by which repeal of 18 U.S.C. §§
3553(b)(1) and 3742(e) would not be ex post facto would be for the
statutes themselves to be "repugnant to the Constitution" and
therefore always void law. Marbury v. Madison, 5 U.S. 137, 180

[1803].   No one, however, can claim this to be the case.   The World expected the Supreme Court to enforce Sixth Amendment protection at sentence, until the Breyer Opinion.

Thus, on all three bases, if the changes that the Remedial Decision makes are demonstrated to be substantive and prejudicial per any of the Calder criteria, and not merely procedural, then the Booker Remedial Decision is unenforcable at least on offenses committed before January 12, 2005.

E.    The Booker Remedial Decision Absolutely Offends The Third And Fourth Calder Criteria:

The Defendant makes no apology for the length of argument. Less than exhaustive treatments of the ex post facto issues are leading to judicial opinions that are "half a loaf," but which then become cited as though they were a full treatment of the question.    Where the scope of analysis required under this subsection is itself an entire subject, the Defendant gives this topic its own full next Section of argument.

THE BOOKER REMEDIAL OPINION OFFENDS THE THIRD AND FOURTH
CATEGORIES OF EX POST FACTO PROHIBITION:

When correctly analyzed, the Booker remedy absolutely effects
a fully substantive increase to the Constitutionally authorized
sentence which a federal defendant can receive for any conviction
(Calder Category III) and does so for "less evidence" than would
have been required to inflict the same sentence under the Sentenc-
ing Guidelines, both as applied (preponderance) and as they should
have been applied (beyond a reasonable doubt to a jury). Calder
Category IV. Again, to avoid the chronic underanalysis that is
endemic to the caselaw now appearing on the ex post facto subject,
the Defendant explains both the legal principles and the practic-
ality of his reasoning for the conclusion stated above.

A.  Distinction Between "Charge Offense" And "Real Offense,"
    The Unacknowledged Source Of The Problem:

Originally, sentencing for felony in Shakespearian times was
death. This was eventually recognized as being over-simple to the
equity owed the convicted person. The penalty for felony was
gradually ameliorated over several centuries, but the legal
fiction that the judge should be sole arbitor of sentence was
preserved into recent times. Williams v. New York, 337 U.S. 241,
251-52 [1949] (sentence of court basically unreviewable).

Supreme Court decisions eventually appeared which placed some
protection on the sentencing process. Townsend v. Burke, 334 U.S.
736 [1948] (convicted defendant still entitled to be sentenced
only on the basis of truthful information); Townsend v. Sain, 372
U.S. 293 [1961] (truthful information and valid inferences from
that information). Eventually, it was recognized that the harms

21

of an erroneous sentencing could implicate Due Process generally.

> "It is now clear that the sentencing process,
> as well as the trial itself, must satisfy the
> requirements of the Due Process Clause."

Gardner v. Florida, 430 U.S. 349, 357 [1977].   It became a
standard of Due Process that the convicted defendant receive
constitutionally sufficient sentencing protection.

> "Discretion is the facility of deciding or
> determining in accordance with circumstances
> what seems fair, just, right, equitable, and
> responsible in those circumstances."

United States v. Hawkins, 275 F.3d 420, 434-35 (6th Cir. 2001).

The remedial opinion majority implicitly seeks return to the
Williams v. New York sentencing era, which in fact no longer
exists, while continuing to exploit the "relevant conduct" concept
under the guise of the Court being authorized to consider "all
information" for purpose of sentencing.   Title 18 U.S.C. § 3661.

American trials, pursuant to the United States Constitution,
are charged-offense proceedings.   The accused defends against the
specific charges of the Grand Jury and extensive protection goes
into defining the crime against which he must defend.   United
States v. Russell, 411 U.S. 423 [1973].   In the Williams era, the
Court was at least sentencing for a highly specific crime of con-
viction, nothing like the modern era of criminal law.

Under the Sentencing Reform Act, the Sentencing Commission
set up a system which was nominally charge-offense in character.
U.S.S.G. § 1A(4), "Resolution Of Major Issues."   Its system, how-
ever, added "description" to the offense.   Ironically, the stated

22

goal of allowing the sentencing court to elaborate on the offense
of conviction at sentencing was said to be to prevent the Govern-
ment from piling on counts of indictment as a means to prosecutor-
ially inflate the sentence for fungible conduct.   Ibid.

In practice, the Government quickly found that, with Congres-
sionally generous statutory maximum sentences for any one count of
conviction, it could secure sentences of any magnitude by import-
ing "real offense" conduct into any available count of conviction.

> "[The] relevant conduct rule invites the pro-
> secutor to indict for less serious offenses,
> which are easy to prove, and then expand them
> in the probation office."

United States v. Beler, 20 F.3d 1428, 1431 (7th Cir. 1994).   It
has been this opportunism rising to an intolerable level of
constitutional abuse that threatened to trivialize the institution
of jury trial which prompted the Supreme Court to finally act in
the line of cases Jones/Apprendi/Castillo/Blakely/Shepard/Booker.[2]

The conduct being imported into the offense of conviction for
sentencing was dimensionally either other crimes entirely or ele-
ments of aggravated crimes to the actual offense of conviction.
The Apprendi line of cases, although couched in procedural ques-
tions, was based on the substantive reasons requiring procedural
change from Guideline practice.   The ex post facto prohibition
clearly demonstrates that the substantive consequences of the

---

[2]  The percentage of trial in the total number of prosecutions is
now something less than 3%.  United States v. Green, 346 F.Supp.2d
259, 266, 281 (D. Mass. 2004) (presenting statistics).   In order
to give the appearance that jury trial remains viable, some courts
treat pre-trial motions before a guilty plea as the equivalent to
the defendant having pursued "trial."   Ibid.

_Apprendi_ line of cases is undeniable.

A major source of confusion needs to be distinguished immedi-
ately.   The new sentencing reform is ex post facto to both the
Guideline S.R.A. as originally implemented and to the Constitu-
tionally applied Guidelines, which were never implemented.   The
discussion which follows addresses both for completeness.

B.   "Real Offense" Sentencing Implicates _Calder_ Category III:

The   post-Booker   S.R.A.   increases   the   authorized   maximum
penalty that can _legally_ be imposed on criminal acts or circum-
stances that only authorized a lesser Guideline sentence under a
preponderance   or   a   constitutionally   protected   S.R.A.   The
sentencing maximum was strictly limited to the Guideline maximum,
except in extraordinary circumstances.   R.L.C. _v._ United States,
503 U.S. 291, 298 [1992] (the Guideline maximum sentence is a
statutory maximum sentence because the command to use the Guide-
lines is statutory).   Thus, every statutory maximum sentence had a
potentially controlling Guideline "sub-maximum" sentence.   This
situation obtained regardless of the standard of proof.   _Infra._

The abolishment of this restriction is ex post facto under
_Calder_ Category III.   _Dobbert_ _v._ _Florida_, 432 U.S. 282 [1977];
_Lindsay_ _v._ _Washington_, 301 U.S. 397 [1937].   To qualify, an
individual need not prove that retroactive application of the law
actually affected the sentence he received in order to invoke ex
post facto.

> "The _Ex_ _Post_ _Facto_ Clause looks to the stan-
> dard of the punishment prescribed by a statute
> rather than to the sentence actually imposed.
> . . Removal of the _possibility_ of [let alone
> where a court was _bound_ _to_] a [lesser]

24

> sentence  . . operates to their detriment in
> the sense that the standard of punishment
> adopted by the new statute is more onerous
> than that of the old."

Lindsay, 301 U.S. at 401, reaffirmed in Weaver v. Graham, 450 U.S.
24, 30 [1981].

> "Critical to relief under the Ex Post Facto
> Clause is not an individual's right to less
> punishment, but lack of fair notice and gov-
> ernment restraint when the legislature
> increases punishment beyond what was
> prescribed when the crime was consummated.

and Miller v. Florida, 482 U.S. 423, 432 [1987] (observing chal-
lenges are not limited to defendants who receive harsher sentence).

What was constitutionally defective to the Guidelines was the
unwholesome practice of prejudicial legal fiction, i.e., that the
person who committed one proven offense became culpable for other
offenses under the deceiving label of "procedural sentencing
rules."  In reality, the Guidelines created a scheme of entirely
separate (e.g., perjury) or outright aggravated (e.g., possession
of firearm) crimes to the convicted statutory offense through just
incremental proof.  The charge-offense was engorged with conduct
which was never convicted.  But, regardless, the conduct which
could qualify to become allowable for punishment was delimited by
the Guideline sentencing range for that total conduct.  It is
undeniable that this limitation has been removed, even as the
Courts purport to use the Guidelines as advisory and to sentence
defendants "reasonably."  Therefore, the Booker relief opinion is
ex post facto under Category III.

The reviewing courts are greviously underanalyzing the notice

25

protection owed the accused vis a vis ex post facto, even were this the limit of the protection afforded. To a court, the Government claims that announcement of the statutory maximum in the United States Code is adequate notice to the accused. This whole approach is flawed as addressed by the Defendant's main argument. But it has been given legal traction by a judiciary that has underanalyzed the issue. To date, United States v. Gray, 362 F.Supp.2d 714 (S.D.W.Va. 2005); United States v. Duncan, 400 F.3d 1297 (11th Cir. 2005); United States v. Lata, 415 F.3d 107 (1st Cir. 2005); United States v. Jamieson, 416 F.3d 538 (7th Cir. 2005). One fallacy of the simplistic "notice" approach is that if a sentence were previously imposed in excess of the Sentencing Guideline maximum, it would have been reversed per 18 U.S.C. § 3742(e). Mistretta v. United States, 488 U.S. 361 [1989] (Scalia, J., analyzing in dissent). That critical limitation is now expressly abolished.

C. "Real Offense" Sentencing Implicates Calder Category IV:

It has long been recognized that additional facts to a crime can in fact be elements of an aggravated crime. McMillan v. Pennsylvania, 477 U.S. 79 [1986] (discussing authority of legislature to define facts as "elements" or "sentencing factors"). Under the Sentencing Guidelines, such "factor" punishment was universalized. It was not just encouraged, but mandatory, for any additional "crimes" that the prosecution could bring to the attention of the Court with a preponderance of the evidence proof to be added as punishment. The Booker Constitutional Decision analyzed this state of affairs only for the procedural safeguards involved and

26

held that such facts _had_ to be proved to a jury beyond a reasonable doubt. _Booker_, 125 S.Ct. at 756.

The _Booker_ Remedial Decision alters the legal rules of sentencing evidence once again and effectively reduces preponderance proof to its standard for its review, namely "reasonableness." Accordingly, the proof of extra guilt receives less evidence than was required under the historical Guideline application and under what that application should have been per the evaluation of the Constitutional Decision.

Whatever other fundamental defects exist in a legal system that allows the Government to convict for offenses easy to prove and then use that conviction to punish for entirely separate offenses, it is simply not permissible to inflict this lower standard of proof on defendants who committed their offenses before January 13, 2005. To do so violates Category IV of Justice Chase's evaluation of the _Ex Post Facto_ Clause.

27

III.    "CRACK COCAINE" AND "COCAINE FREE BASE" ARE TODAY STILL UNSCHEDULED DRUG  SUBSTANCES NOT SUBJECT TO PROSECUTION AS  AN ELEMENT CREATING A CONTROLLED SUBSTANCE OFFENSE:

The Petitioner argues that the District Court lacked subject matter jurisdiction to hear this criminal case as a "crack cocaine" case. Hagans v. Lavine, 415 U.S. 528 [1974] (whenever jurisdiction is challenged, it must be proved). The issue reduces to a set of questions, whose answers dictate the correct legal result:

1.  Must "legally new" drugs be scheduled before offenses involving them can be prosecuted by law?  Yes.

2.  Is "crack cocaine" a "legally new drug?"  Yes.

3.  Is or was "crack cocaine" ever scheduled?  No.

4.  Can this "crack cocaine" conviction be sustained for an uncontrolled substance?  No.

If drug identity is not just a "factor," but the "element-that-defines-the offense," this question must be resolved. Bunkley v. Florida, 538 U.S. 835 [2003] (definition of knife blade length defining aggravated burglary offense cognizable on collateral attack). Courts are now holding that the subsections of 21 U.S.C. § 841(b) name separate crimes based on the drug identity and the quantity named in the subsection. E.g., United States v. Gonzalez, 420 F.3d 111, 129 (2nd Cir. 2005); United States v. Malouf, 377 F.Supp.2d 315, 328 (D. Mass. 2005). The Constitutional standard to be afforded the treatment of definition of controlled substances must now be recognized to transcend the protection of the Control-led Substances Act alone. Richardson v. United States, 526 U.S. 813, 817-18 [1998] (elements receive the full panalopy of consti-

[1] The Petitioner uses the term "crack cocaine" for both crack or free base rather than repeat both terms everywhere.

tutional protection).

The controversy presented cannot be avoided. United States v. Baynes, 48 F.2d 481, 482 (3rd Cir. 1977) (It is the duty of the Courts to write reasoned opinions on issues of first impression for which no clear precedent exists). And jurisdiction must always be proved. Hagans, supra.

A.   New Drug Substances Must Be Scheduled Before Conduct Involving The Substance Can Be Prosecuted:

The Controlled Substances Act (C.S.A.) of 1970 does not control any substance unless and until it is scheduled. H.R. 91-1444, p. 22. It begins from the proposition that all substances are free to be used unless the Government demonstrates a precise need for control and the nature of the control required. If deemed necessary for extraordinary circumstances, interim scheduling may be obtained with much less evaluation or the substance may be deemed an analogue and treated as the scheduled substance. 21 U.S.C. §§ 811(h)  and  813. These principles apply both to substances just recognized as abusable or newly created and recognized as abusable post enactment of the original law.

> "A procedure is established for the classification of future drugs which create abuse problems."

Report of the Committee on Interstate Commerce on the Comprehensive Drug Abuse Act, Summary of the Bill, Title II:    Control and Enforcement, H.R. No. 18,583.

The public protection adopted was mandatory and rigorous evaluation of the substance proposed for control by professionals, with the overview of high-ranking Government officials, i.e., the

29

Secretary of Health, Education, and Welfare (today Health and Human Services) and the Attorney General.

> "When adding a substance to a schedule, the Attorney General <u>must</u> follow specified proce- dures.    First, the Attorney General <u>must</u> request a scientific evaluation from <u>the</u> Secretary of Health and Human Services (HHS), together with a recommendation as to whether the substance should be controlled.    A substance cannot be controlled if the Secretary recommends against it.    21 U.S.C. § 811(b). Second, the Attorney General <u>must</u> consider eight factors with respect to the substance, including its potential for abuse, scientific evidence of its pharmacological effect, its psychic or physiological dependence liability, and whether the substance is an immediate precursor of a substance already controlled. 21 U.S.c. § 801(c).    Third, the Attorney General <u>must</u> comply with the notice-and-hearing provisions of the Administrative Procedures Act, 5 U.S.,C. §§ 551-559, which permit comment by interested parties."

<u>Touby</u> <u>v</u>. <u>United</u> <u>States</u>, 500 U.S. 160, 162-63, 111 S.Ct. 1752, 114 L.Ed.2d 219 [1991] (emphasis added).

Whenever Courts of Appeal have previously been presented with a drug substance having a structure that is <u>chemically</u> distinguish- able from any substance already scheduled, they have strictly enforced the scheduling requirement. <u>United</u> <u>States</u> <u>v</u>. <u>Spain</u>, 825 F.2d 1426, (10th Cir. 1987); <u>United</u> <u>States</u> <u>v</u>. <u>Emerson</u>, 846 F.2d 541 (9th Cir. 1988).    The defect is fatal to any prosecution. <u>United</u> <u>States</u> <u>v</u>. <u>Caudle</u>, 828 F.2d 1111, 1112 (5th Cir. 1987) ("Defendants clearly could not be indicted for distributing a drug that was not placed on the list of controlled substances.").

Until today, there has never been a controversy over a drug whose putative active ingredient is already scheduled, but which

30