requires scheduling in its own right. The situation has occurred previously; but the Attorney General acted to schedule the substance before initiating any prosecutions in its name. E.g., vide infra, the "opiates." The course of action was the proper course because the "drug within a drug" was a possibility already anticipated by the drafters of the C.S.A.

> "(4) The drug or drugs containing a substance are new drugs so related in their action to a drug or drugs already listed as having a potential for abuse to make it likely that the drug will have the same potentiality for abuse as such drugs, thus making it reasonable to assume that there may be significant use contrary to or without medical advice, or that it has a substantial capability of creating hazards to the health of the user or to the safety of the community."

Recommended Criterion (4) for evaluation of newly recognized drug substances, H. R. Report 91-1444, p. 34.

While the 1970 language of the statute reflects a higher sensitivity to diversion from legitimate sources rather than clandestine manufacture of drugs, the presence of a controlled substance in the new substance never automatically defines the new substance as controlled. For example, in 1970, Schedule II(a)(1) read:

> (1) Opium and Opiate, and any salt, compound, derivative, or preparation of Opium or Opiate.

Today, the same Schedule reads:

> (1) Opium and Opiate, and salt, compound, derivative, or preparation of opium or opiate, excluding apomorphine, the baine-derived butorphanol, dextrorphan, nalbuphine, nalmefene, maloxene, and maltrex-

one, and their respective salts, but
including the following:

    (1)  Raw opium
    (2)  Opium extracts
    (3)  Opium fluid
    (4)  Powdered Opium
    (5)  Granulated opium
    (6)  through (18) others.

All of the specific opiate substances nominally appear to be
scheduled because they all "contain opium." But if this were
legally true, the addition of the eighteen new substances would be
a superfluous exercise. It was not. Under the protocols and
criteria of the C.S.A., each of the substances listed was qualified
as a "legally new drug." Despite putatively trivial changes, e.g.,
"powdering," the medical community and the statute maintain that
such alterations potentially change the nature of the drug, and
such must be presumed until proved otherwise.

The methamphetamine family of drug substances is another
example. Methamphetamine, in its water and its salt solutions, was
originally placed in Schedule II, while methamphetamine pills and
powders were placed in Schedule III. The Schedule II form of the
drug permitted a different means of administration, specifically
intravenous injection, which was determined to be more dangerous
than ingestion. Still another form of methamphetamine, the
formulation in Vicks Inhalers, was outright exempted from control.
In each case, the proper legal classification was only established
after evaluation per 21 U.S.C. §§ 811 and 812. The presence of the
same "active ingredient" in each form was not determinative of the
scheduling.

The analogy of these two examples to "crack cocaine" is inescapable. If "crack cocaine" definitionally legally qualifies as a "new drug," then crack must be scheduled before it can be charged as as the controlled substance element of a crime.

B. Crack Cocaine Is A Legally New Drug:

This litigation will be resolved on the question whether crack cocaine must be declared to legally be a "new drug." The Government always argues that Schedule II(a)(4) is all-inclusive of any cocaine substance. It once said in argument,

> "A cursory reading shows how broad the definition of a cocaine-related controlled substance is - it is essentially anything that has cocaine in it . . ."

The fact of this statement unwittingly leads to discovery of a stupendous dishonesty in the Narcotics Penalty Act of 1986.

Early in 1986, the Justice Department believed it necessary to ask Congress to amend the language of Schedule II(a)((4), i.e., "cocaine," so that it could include "coca tea," which was nonprosecutable at the time for the same reason as the opiates above.[2]

_____

[2] See Ronald K. Siegel, Ph.D., Intoxication, pp. 300-01, Simon and Schuster Publishers, New York, N.Y. 1989. In the early 1980's, the Peruvian Government's National Enterprise of Coca began marketing coca tea in the United States, primarily through mail order and health food stores. Dr. Siegel and his research group studied a substantial group of coca tea users for three years and published the results in the Journal of the American Medical Association. R. K. Siegel, et al., J.A.M.A. Vol. 255, pp. 40 (1986). The conclusion of the study was that coca tea represented a safe form of cocaine use; no one abused the tea or suffered ill effects.
When coca tea came to the attention of law enforcement officials in the Justice Department, they studied this coca use for possible prosecution of the tea drinkers. But they reached the conclusion that "coca tea" was not a controlled substance.

This amendment was represented as being individual and isolated, not general.

> "The amendment sought only to clarify the definition of coca leaves. This is apparent from both the statutory language and the legislative history."

United States v. Daniel, 813 F.2d 661, 663-64 (5th Cir. 1987).

If it remains the Government's position after footnote 2 that "everything is cocaine," then the present argument is a challenge to the 1986 statutory amendment for making the Schedule unconstitutionally overbroad. Touby, supra.

1. Definition Of "Legally New" Drug:

All technical C.S.A. definitions not expressly given in § 802 are to be adopted from those of the Food, Drug, and Cosmetic Act (F.D.C.A.). Prettyman Commission Report, Recommendation Number 10 and H. R. Rep. 91-1444, p. 18, directing all definitions to 21 U.S.C. § 301, et seq. In § 302 "new drug" is defined by either of two working criteria:

> (1) Any drug the composition of which is such that such drug is not generally recognized among experts who are qualified by scientific training and experience to evaluate the safety

---

The tea importers, distributors, and drinkers could not be prosecuted under the then existent law. And when the Attorney General considered scheduling "coca tea," Dr. Siegel's clinical study was a complete objective bar to the ordinary justification for scheduling, potential for abuse. Coca tea was unabusable per se because the denaturing chemicals present in the coca leaf tea prevented overuse. The Justice Department then elected to bypass the scheduling process and went to Congress with a bogus story of there being a necessity to correct technical deficiencies to the language of the cocaine schedule for coca leaves, not ever mentioning the tea. S. Rep. No. 225, 98th Cong., 1st Sess. 262-63; 1984 U.S. Code & Admin. News 3182, 3444-45.

and effectiveness of drugs as safe and effective
under the conditions prescribed . . .

(2)  Any drug the composition of which is such
that such drug as a result of investigation
to determine its safety and effectiveness for
use under such conditions has become so recog-
nized, but which has not, otherwise than in
such investigations, been used to such a
material extent or for such a material time
under such conditions."

21 U.S.C. § 321(p).

It has been legal error for the courts to equate the definition
of "crack cocaine" with chemical definitions. United States v.
Davis, 864 F.Supp. 1303, 1307 (N. D. Ga. 1994); United States v.
Brown, 859 F.2d 974, 976 (D.C. Cir. 1988) (defining "crack" as
cocaine possessing a "hydroxyl radical"), rev'd United States
v. Gaulteau, 4 F.3d 1003, 1004 (D.C. Cir. 1993) (definition in
Brown "simply incorrect").

Any technical "drug" definition must comport with the "whole
drug principle." United States v. Generix Drug Corporation, 460
U.S. 459, 463 [1983]:

"The term 'drug' is plainly intended through-
out the [Food, Drug, and Cosmetic] Act to
include entire drug products, complete with
inactive ingredients."

As reason, this Court has held (1) that law which would deal with
people putting substances into their bodies would be grounded in
reality, not some legal fiction, and (2) that the criminal laws
based on the F.D.C.A. only maintain their legal integrity under
a "whole drug principle." Generix, supra. In fact, pharmaceutical
"crack cocaine," known as Esterene, had to obtain approval through

a "new drug application" (N.D.A.). "Esterene In The Treatment Of Rheumatoid Arthritis," Arthritis News Today, Vol. 2, pp. 1-5 (April, 1980); "The Treatment of Active Rheumatoid Arthritis and Allied Inflammatory Diseases," 15th Annual Congress on Rheumatology, June 26, 1981, Paris. The N.D.A., of course, is the F.D.C.A. analog to C.S.A. scheduling and a fortiorari proves that crack cocaine required scheduling in order to be prosecuted as its own controlled substance.

Since Generix the criminal Courts themselves have employed the "whole drug principle" in deciding legal matters:

> "[. .] Both Congress and the F.D.A. recognize that substances are to be judged as a whole, and not merely by whether they contain one ingredient."

United States v. Housley, 751 F.Supp. 1446, 1447 (D. Nev. 1990); United States v. Viernes, 763 F.Supp. 1068, 1071 (D. Hawaii 1991). By its medical definition, crack is a distinguishable kind of physical matter, which is a new substance incidentally containing cocaine. United States v. Bishop, 894 F.2d 981, 986 (8th Cir. 1990) ("Substance means a distinguishable kind of physical matter."). The definition of drug and substance must be followed wherever they take the Controlled Substances Act in practice. United States v. Turkette, 452 U.S. 576, 580 [1981] ("If a statute defines a term in its definitional section, then that definition controls whenever that term appears in the Act."). By the Constitutional Due Process owed by the Controlled Substances Act, the elements of the offense which are the controlled substances must be established by the procedures of §§ 811 and 812. The

determinations under §§ 811 and 812 should have been made before creating a crack cocaine offense.

   C.   The Department of Justice Was Knowingly
        Dishonest In Its Promotion Of The Narcotics
        Penalties Act Without Scheduling Crack
        Cocaine:

All five proposed crack Cocaine bills introduced in 1986 opened with a provision to statutorily schedule crack in Schedule I, e.g.,

        Sec. 2 ADDITION OF COCAINE IN ANY BASE FORM
               AS SCHEDULE I CONTROLLED SUBSTANCE.

        Schedule I of section 202(c) of
        the Controlled Substance Act (21
        U.S.C. § 812(c) is amended by adding
        at the end the following:

            (d) cocaine in any base form.

Scheduling language in Senator Chiles' Bill, which became the final statute, but without this scheduling provision.

   Scheduling was deleted by the Judiciary Committee at the behest of the Justice Department Representative. The legislators were reminded that, nationwide, about 3,500 defendants had already been sentenced for "crack cocaine" as normal cocaine. All those convictions would be rendered null and void instantly if Congress now scheduled crack cocaine as a "new drug substance." This reason, and this reason alone, Petitioner submits, was the reason why scheduling was removed from the Bills. After all, had legislators really believed that crack cocaine was already scheduled, their bills would have sought to "re-schedule" the crack form of cocaine from schedule II to schedule I. But Congress was even ignorant of Esterene, because a drug used in medicine cannot be placed in Schedule I at all, which Schedule's drugs are supposed to be devoid

37

of medical value.

There was certainly no honest reason to avoid scheduling. The later analysis supports the legal fact that crack was not somehow alternately scheduled.

> "Neither 'cocaine base' nor 'crack cocaine' nor any equivalent term is mentioned in section 841(a) or in any of the controlled substance schedules; nor is there anything in any of the controlled substances schedules which can be said to describe 'cocaine base' (or 'crack cocaine') but not 'cocaine base' or to describe cocaine base (or 'crack cocaine') as a discrete variety or type of cocaine."

United States v. Diesch, 20 F.3d 130, 149 (5th Cir. 1994).

Today, it is clear that the identity of the controlled substance defined the offense of conviction, even more than for drug quantity.

> "Here, the term 'cocaine base' was neither irrelevant nor unfairly prejudicial. The indictment served as notice to Lewis of the nature of the charges against him. Indeed, identifying the substance as cocaine base was an essential element of the Government's case against Lewis."

United States v. Lewis, 40 F.3d 1340, 1346 (1st Cir. 1994).

D. A Conviction For "Cocaine" Can No Longer
   Be Sustained:

Cases have periodically raised the scheduling issue in the past; however, the arguments have all been based on some perceived piccadillo rather than the exhaustive analysis presented here. This argument has reached Circuit Courts in the past, only to be summarily dismissed by those Courts' erroneous belief that drug identity was only a sentencing factor to the "controlled substance

38

element." This excuse is no longer sustainable in good faith, see preceeding double argument, citing United States v. Gonzalez, 420 F.3d 111, 129 (2nd Cir. 2005) and United States v. Malouf, 377 F.Supp.2d 315, 328 (D Mass. 2005).

Wherefore, certiorari should be granted, the Petitioner's conviction and sentence should be vacated, and the case remanded for proceedings consistent with the fact that crack cocaine is not a controlled substance.

IV.    THE COCAINE BASE/CRACK COCAINE SENTENCING CLAUSES, 21
       U.S.C. §§ 841(b)(1)(A)(iii) AND (B)(iii), ARE CONSTI-
       TUTIONALLY VOID FOR VAGUENESS:

A constitutional vagueness challenge to a statute is jurisdictional in nature; therefore, no showing of cause and prejudice is required. United States v. Spinner, 25 F.3d 1314, 1317 (6th Cir. 1994).

Neither crack cocaine nor cocaine base is named on the Schedule of Controlled Substances. Diesch, supra. Although only cocaine is named on schedule II, all Circuits hold that cocaine base is not equivalent to cocaine powder, the scheduled salt, for the penalties of 21 U.S.C. § 841(b)(1)(A)(ii) and (B)(ii). E.g., United States v. Edwards, 98 F.3d 1364, 1369 (D.C. Cir. 1996), cert. denied, 117 S.Ct. 1347 [1997]; United States v. Camilo, 71 F.3d 984, 990 (1st Cir. 1994), cert. denied, 116 S.Ct. 1555 [199]; United States v. Reddick, 90 F.3d 1276, 1282 (7th Cir. 1996); United States v. Sloan, 97 F.3d 1378, 1381-84 (11th Cir. 1996).

The statement of position in United States v. Fisher, 58 F.3d 96, 99 (4th Cir. 1995), cert. denied, 516 U.S. 927 [1995], is the most analytical:

> "If we were to read clause (ii) to include
> cocaine base because cocaine base is pure
> cocaine, we would of necessity have to conclude
> there was no purpose for including clause
> (iii) in that statute since that clause also
> addresses cocaine base. . [I]f clause (iii)
> isolates crack cocaine for special treatment,
> it is illogical to read clause (ii) also to
> include crack cocaine."

Thus, Fisher holds that "one purpose of the Narcotics Penalties and Enforcement Act of 1986 was to recognize crack as a distinct

and separate drug from cocaine hydrochloride." Id., citing 132
Cong. Rec. S 14, 288 daily ed., September 30, 1986. But because
the legal definition of all scheduled cocaines is contained in
21 U.S.C. § 812 Schedule II(a)(4), and because the language of
§§ 841(b)(1)(A)(ii) and (B)(ii) is virtually identical to the
language of the (a)(4) Schedule, the subclause (ii) penalty statutes
must include cocaine base if that cocaine is in fact scheduled.
There is simply no legal principle by which to read the same
language as inclusive in the scheduling section but exclusive in
the sentencing section of the law. Sutherland's Statutory
Construction, § 45. Cocaine base cannot be read out of 841(b)(I)(A)
and (B)(ii) without de facto gutting it from the list of scheduled
cocaine also.

Congressional intent is an insufficient basis to thwart the
legal import of the statutory construction. Salinas v. United
States, 522 U.S. 52 [1997] (not allowed to circumvent statutory
text by pointing to legislative history). Congress could not define
crack cocaine without admitting that 3,500 people were in prison
for an uncontrolled substance. But its "solution" has created
a constitutional vagueness problem for crack cocaine being legally
contained in two penalty provisions at the same time. Korlender
v. Lawson, 461 U.S. 352 [1983]. Clause (ii) has been used to
sentence crack cocaine defendants before 1986 and does not today
exclude crack cocaine from its sentencing scope.

The Petitioner will regard as dishonest any attempt to conflate
the argument here with the scientific definitions argument presented
in United States v. Davis, 864 F.Supp. 1303 (N.D. Ga. 1995).

41

NOTHING  that is scheduled  cocaine can be outside the scope of §§ 841(b)(1)(A)(ii) and (B)(ii) because subsection (ii) is here proven to be all inclusive.

Wherefore, this Court should adopt the less harsh of two eaually reasonable interpretations of a statute in order to guarantee that the statute provided fair warning of the exact conduct prohibited by its terms.  The sentence to this case must be vacated and the Defendant resentenced to a sentence for powder cocaine.

**CONCLUSION**

Wherefore, for the evidence and arguments presented in this Motion To Amend § 2255 Motion, Mr. Mendez prays that his sentence will be vacated and that he will be resentenced for cocaine powder to the terms of his indictment and admissions of his guilty plea.

Respectfully submitted,

Jose Anibal Mendez, Pro Se
F.C.I. Fort Dix
P.O. Box 2000
Fort Dix, New Jersey 08640-0902

CERTIFICATE OF SERVICE

I hereby certify that I have mailed a true copy of the above Motion To Amend § 2255 Motion with its supporting arguments and evidence to:

Office of United States Attorney
District of Connecticut
141 Church Street
New Haven, Connecticut  06510

on the  5 th day of May, JUNE 2006, postage prepaid.

Jose Anibal Mendez

APPENDIX A:   BACKGROUND TO LEGISLATION

In light of al. the contrary evidence which surfaced almost immediately following the 1986 enactment of the penalties for crack cocaine, the perpetuation of the statute to the current day is an example of law contrary to equity. At first, the contrary evidence, like the "evidence" which produced the legislation, was largely anecdotal, fragmented and incomplete. But today the four Congressional reasons for the law are evaluated analytically and found wanting.

In the United States Sentencing Commission Report "Cocaine And Federal Sentencing Policy," enough information was presented to cause any reviewer to question the soundness of the legislation. In the end, however, that "informed process" was reduced to a political vote that ignored the medical and social science of the drug.

The nature of law-making is inherently imperfect. But in the province of criminal law, citizens are entitled to honesty in the laws when truth becomes available, not bombast. The crack cocaine penalty statutes have survived only because litigants have never been able to address their defectiveness exhaustively. The preceeding arguments are exhaustive over Due Process concerns in the law itself. This discussion is exhaustive over substantive Due Process in the law-making that produced the law. Congress only could and did enumerate certain reasons for enacting the Narcotics Penalty Act; each of its four possible reasons is analyzed and discredited as legitimate reason for creating the draconian penalties for "crack cocaine."

A-1

Senate Committee on Governmental Affairs, 99th Cong.2d, Sess. 20
(1986), p. 1.

Ultimately, Congress relied on the death of one person, Mr.
Bias, to an inordinate degree in order to persuade itself that
"crack" was causing a new form of overdose drug fatality.  In the
several hours of debate that this legislation occupied, the Bias
death is mentioned eleven times.  "Cocaine And Sentencing Policy,"
United States Sentencing Commission, February, 1995, p. 123.  It
is uncontested that these references underscored an abiding belief
in the Congress that "crack" was an exceptionally dangerous over-
dose drug.

Both the Len Bias story and its suggestion that crack cocaine
was frequently lethal were factually wrong.  It was eventually
revealed that the attribution of the Bias death to crack was the
result of a premature, off-hand statement by Maryland Assistant
Medical Examiner Dr. Dennis Smith that "[Mr. Bias] probably died
from freebasing cocaine."  Only later did Maryland's Chief Medical
Examiner, Dr. John E. Smialek, correct the press that Mr. Bias had
only powder cocaine residues in his nasal passages.  Only the
erroneous speculation of Dr. Smith, however, reached the public at
large.  The mistake was not officially corrected until Dr.
Smialek's expert testimony in United States v. Tribble (District
of Maryland).

Based on medical principle, the conclusion over toxicity is
no different than that of the Bias story.  The plain medical fact,
established by fifteen years of data, is that neither crack
cocaine nor cocaine free base produce any statistically greater or

A-3

lesser count of fatal drug overdoses than powder cocaine.  D. K.
Hatsokami and M. W. Fishbein, Journal Of The American Medical
Association, Vol. 276, No. 19, pp. 1580, 1583 (November 20, 1996)
(then comprehensive review of all medical study and clinical data
on crack cocaine use).    Indeed, the reported studies begin with
the observation that a crack-cocaine-user dosage is only approxi-
mately one-tenth that of an insulflation-user dosage.  A priori,
if other factors are equal, toxicity is one-tenth.  Additionally,
of that one-tenth dosage a significant portion of the dose is
burned to oblivion in the required form of administration, i.e.,
smoking.    B.  R.  Martin,  L.  P.  Lane,  J.  P.  Boni,  Journal  of
Analytical Toxicology, Vol. 13, pp. 158-63 (1989).  Thus, material
balance alone makes it difficult for even the most abuse crack
user to achieve lethal concentrations of drug in the blood stream.

> [The volunteers (six) described below were
> smoking 50 milligrams of cocaine base (radio-
> labeled) in a specially designed glass pipe
> under a rigidly controlled protocol].
>
> "Approximately 25% of the original material
> was recovered from the pipe after the termin-
> ation of smoking and therefore never reached
> the mouths of the volunteers.  During heating,
> a portion of the cocaine free-base decomposed.
> Simulated   smoking   experiments   in   vitro
> indicated that, of the amount of the drug not
> trapped in the pipe, only 43% was cocaine,
> [the rest being decomposition products], and
> that over 90% of this cocaine (i.e., about 40%
> of the original dose) was delivered during the
> first four puffs (i.e., during the first two
> minutes of smoking).   These findings indicate
> that of the original 50 milligrams of cocaine
> free-base placed in the pipe bowl, only 36%
> could have been inhaled."

M. Perez-Reyes, S. DiGuiseppi, G. Ondrusck, A. K. Jeffcoat, and C.

E. Cook, "Cocaine Free-Base Smoking: A Clinical Study," unpublished manuscript finally reported by R. K. Siegel, "Cocaine Smoking," Journal Of Psychoactive Drugs, Vol. 14, No. 4, October-December, 1982, p. 310.

The scientifically predictable result of this analysis of "mass balance" of cocaine smoking is that such smoking will not produce lethal bloodstream concentrations absent extraordinary abuse. In the now perceived peak year of crack cocaine smoking, 1991, while emergency rooms reported 38.2% of overdose patients to have "smoked cocaine" and 11.3% to have "snorted," almost one-quarter of the snorting users became fatalities compared to under ten percent of smoking users. "Drug Use Forecast," 1993 Annual Report, November, 1994, Drug Abuse Warning Network (DAWN).

Returning to the issue of what perspective was lacking in the 1986 Congress, there is actually no untoward crack cocaine over-dose problem that is materially different from that possessed by powder cocaine abuse. If anything, the clinical studies indicate that it is more difficult to fatally "sandbag" a lethal crack dose because the smoking-administered doses are immediately transferred to the bloodstream, where the effects are immediate as well. Insulflated cocaine, rather than becoming immediately available to the metabolism, is gradually adsorbed to greater and greater bloodstream concentrations. When lethality symptoms have been achieved, there is still more cocaine coming. As a result, the patient is locked into an irreversible process by his previous actions. And this consequence is plainly borne out by the gross emergency room statistics.

It is not possible without establishing the testimony of more experts to be more thorough on this subject. However, it is undeniable that the opinion of the 1986 Congress was technically uninformed. Simply stated, crack cocaine does not produce physiological effects resulting in death any more often than other forms of cocaine, and appears to result in death <u>less</u> <u>often</u> in actual overdose patients. The threat potential advanced by Senator Chiles in urging passage of the Narcotic Penalties Act to the Senate was false. 132 Cong. Rec. 26,447 (September 26, 1986). Crack cocaine is not prejudically distinguishable from powder cocaine on the basis of lethality.

CONGRESSIONAL REASON II:    Crack  Cocaine  Was  Considered  To  Be
                            Extraordinarily  Addictive  Compared  To
                            Cocaine Powder:

Again  prompted  by  anecdotal  reports,  it  became  the  uncon-
tested  Congressional  perception  that  crack  cocaine  possessed
extraordinary  powers  of  addictiveness  compared  to  cocaine  hydro-
chloride.    In  promoting  S.  2580  on  the  Senate  floor,  Senator
D'Amato  stressed,  in  comparison  with  cocaine  powder,  that  crack
cocaine  was  clearly  "the  more  addicitive  .  .  substance."    132
Cong.  Rec.  S8092  (June  6,  1986).    This  claim  of  addictiveness  was
stretched  to  the  point  where  crack  cocaine  was  portrayed  as  being
immediately  addicting.    132  Cong.  Rec.  S14,293  (September  30,
1986,  statement  of  Senator  Bumpers).    As  a  result  of  this  alleged
addictiveness,  it  was  being  predicted  that  crack  cocaine  abuse
would  become  an  epidemic  and  overwhelm  all  law  enforcement  effort.

> "The  carnage  [this  drug]  is  going  to  leave  in
> its  path  .  .  is  something  I  don't  know  if  this
> country  can  survive.    I  have  never  seen  law
> enforcement  as  concerned  or  frustrated  or
> upset  as  I  see  them  in  my  State  wherever  I  go.
> [     ].    This  whole  thing  is  a  tidal  wave  that
> has  hit  everywhere."

Senator  Chiles,  Crack  Cocaine  Hearing,  supra,  p.  6.

> "The  Permanent  Subcommittee  On  Investigations
> meets  today  to  examine  a  frightening  and  dan-
> gerous  new  twist  in  the  drug  abuse  problem  -
> the  growing  availability  and  use  of  a  cheap,
> highly  addictive,  and  deadly  form  of  cocaine
> known  on  the  streets  as  'crack.'"

Senator  Roth,  ibid.,  p.  1  (emphasis  added).

No  clinical  evidence  was  ever  cited  in  support  of  the  ultra-

addictiveness claim; the proposition was simply accepted ad hoc. What was pointedly ignored was the fact that an entire body of medical literature had treated the phenomenon of cocaine smoking, both as powder and as base, beginning as early as 1885. A longitudinal study of recreational cocaine free base smoking was performed in 1975 at the University of California, Los Angeles. For the study, it had been possible to locate 99 social/recreational users (85 males and 14 females) who used a minimum of one gram of cocaine per month. Twelve subjects were already smoking free base as their preferred method of administration. However, even after 39 percent of the subjects remaining in the study by 1979 reported having smoked free base at least experimentally, only six (9.8%) reported themselves as being primarily smokers.

One point of the study was that, in an atmosphere where no method of administration was either promoted or discouraged, smoking failed to win over anything approaching a majority of the people freely using cocaine to begin with. It simply reduced to a matter of preference, not addictiveness.

Dr. Siegel's exhaustive 1982 "Cocaine Smoking" study goes on to point out that by March of 1980 it was reliably estimated that over one million people in the United States had already tried smoking free base. Despite heavy promotion by the paraphernalia industry, market studies estimated that only 10 to 20 percent of the intranasal users had become exclusively free base smokers. While the methods recommended for free basing in that era were more involved than the bicarbonate approach, all the alternative methods were published and well known by the using community. A.

A-8

Gotlieb, Footnote 4.  A significant group of users had definitely used the simpler precipitation procedure sans solvents, with just ammonia  or  bicarbonate.   Ibid.   Yet,  there  had  been  no  mass conversion to freebasing, as would be expected if it were highly addictive compared to powder.

In  addition  to  the  statistical  evidence  that  cocaine  free base enjoyed no phsyiologically-based preference over powder, a number of medical studies had also been performed which evaluated the drug on the metabolic level.  F. R. Jerri, C. C. Sanchez, T. Del Pozo, and M. Fernandez, "The Syndrome of Coca Paste," Journal Of Psychedelic Drugs, Vol. 10, No. 4, pp. 361-370 (1978).  The study picked already chronic base smokers, 158 heavy abusers.  The smokers  were  ingesting  unknown  but  smaller  amounts  of  companion alkaloids, kerosene, methanol, and potentially all the pyrolysis products of the same.  For the group disposed to smoke coca paste, the  study  pointed  out  that  smoking  produced  a  "characteristic syndrome  of  euphoria  followed  almost  immediately  by  compulsive anxiety to smoke more paste."  It concluded that is was not the drug per se which created the craving, but an unidentifiable characteristic shared by the users.

In  a  private  communication  to  Dr.  Siegel,  the  principal investigator pointed out that, when the study was broadened to a more generally representative group of users, the addictive effect was comparable to that with other forms of cocaine use.  R. R. Jerri,  personal  communication,  October  10,  1978.   For  those persons predisposed to the effects of high local cocaine concen-tration, the results are analagous to craving in other examples of

drug abuse, i.e., heroin, PCP, methamphetamine.  The importance
for the affected group cannot be minimized; but the group is only
a subset identical to those subsets present in every other sub-
stance abusing group.  Even heavy abusers were found to "titrate
intake" to maintain plasma levels of cocaine within ten percent of
some, for them, steady-state concentration, albeit significantly
higher than the titre for a user not in the predisposed category.
D. Paly, et al., "Cocaine Plasma Level After Cocaine Paste
Smoking," Proceedings Of The Inter-American Seminar On Medical And
Sociological Aspects Of Coca And Cocaine, Lima, Peru, July 1-6,
1979, pp. 106-110 (Pacific Press).

Even the underground literature was reporting scientific
studies.  And another study at U.C.L.A., for example, had monekys
given unlimited access to pharmaceutically pure cocaine free base
cigarettes (23 hours per day for 20 days) who self-regulated their
consumption to 0.162 gram of cocaine per day.  R. K. Siegel and M.
E. Jarvik, "Self-Regulation Of Coca-Chewing And Cocaine-Smoking
Monkeys," Proceedings, supra.

All of this information, and a great deal more, was available
when Congress specially criminalized crack cocaine, but none of it
was used.  In view of the ready availability of information, it is
not justifiable for the statute enacted to be predicated on the
phony claims of super-addictiveness that were pandered in the 1986
legislative session.  The non-super-addictiveness reports of 1986
were all sustained on later reviews.  See Hatsokami, et al.,
J.A.M.A., supra.  The continued legitimacy of the law simply
cannot be sustained on this claim of addictiveness.

A-10

CONGRESSIONAL REASON III:    Use Of Crack Cocaine Correlates With
                             The Commision Of Violent Crimes

It is almost beyond peradventure that the Congress which enacted the Anti-Drug Abuse Penalties Act of 1986 believed that a direct correlation existed between sale and use of cocaine base products and the commission of violent acts.  In 1986, although never amounting to more than a recitation of some individual examples, it was frequently expressed that gang activity was linked to the crack cocaine trade.  132 Cong. Rec. 31,30 (October 15, 1986, Senator Chiles, floor statement).  The Defendant will not contest that later statistics bore out the perception that there was extra violence in the crack cocaine milieu compared to that for the more established drug products.

The due process difficulty identified in this Reason is that it was not crack cocaine as a drug that was responsible for the increased violence.  Even when Congress was considering this legislation, the true underlying causes for the violence were not factors that could be controlled by a statute penalizing distribution of the substance; in fact, it was by removing established dealers that the law was the single most contributory factor increasing the violence, especially after what amounted to mass marketing of crack cocaine through putatively "anti-crime" news and publicity endearing to politicians.

Despite the defective logic about to be discussed in this section, Congress plunged ahead with an enactment strongly conditioned on the basis that new law would alleviate the violence.  Congress was oblivious to the role it was contributing to promot-

ing the same evil that it was ostensibly acting to prevent. Some two years later, Senators and Congressmen alike were still touting further penalties as a cure. See 134 Cong. Rec. S17,301 (October 21, 1988, Senator Helms, "crack has been linked to violent crime" and should be subject to greater mandatory minimum penalties); 134 Cong. Rec. E2,701 (August 10, 1988, Representative Miller, continuing to link the dealing in crack cocaine with gang activity). The congressional record of even this relatively later era is devoid of expert evidence, or even the possibility of other causes for the violence problem; and it is utterly oblivious to the effect of law enforcement itself toward fostering the violence.

The basis for appreciating the nature of violence which acocmpanies the drug subculture was already well documented by professionals before Congreee approached the 1986 crack cocaine issue. See, for example, P. Goldstein, "The Drug/Violence Nexus: A Tripartitie Conceptional Framework," 14 Journal Of Drug Issues, Fall, 1985, p. 493. Yet, Congress applied none of this knowledge and blindly pandered to the news media for the moral panic value that connecting drugs to violence has in society.

The Goldstein study, and virtually every study to come after it, concluded that the crimes associated with the drug subculture break down into three categories: economic crimes, psychopharmacological crimes, and systemmic crimes. Id. No other categories have ever been identified. Drugs And Violent Crimes; Pathways To Criminal Violence, P. Goldstein, N. A. Weiner, et al. (eds.), 1989, .p. 16. These reports conclude that economically compulsive crime, e.g., simple larceny, shoplifting, etc., is almost always

non-violent.  While there are, of course, exceptions and universal
statements are impossible, the violent economic events simply fail
to be statistically significant, even when the perpetrator is an
addict.

> "Economically compulsive actors are not
> primarily motivated by impulses to act out
> violently.  Rather, the primary motivation is
> to obtain money to purchase drugs.  Violence,
> [when it occurs], generally results from [fac-
> tors like] . . the perpetrator's own nervous-
> ness, a victim's reaction to discovery, the
> presence of weaponry, . . . and so on."

P. Goldstein, supra, 1989 Violent Crime Study.

It is well established today, of course, that crack cocaine
abusers overwhelmingly satisfy their crack needs by selling the
requisite amount of crack to others.  J. Inciardi and A. Por-
rieger, "Crack-Cocaine Use And Street Crime," Journal Of Drug
Issues, Vol. 23 (1994-95), p. 138 (98 percent of street level
users survive by retail drug sales).  The study goes on to analyze
what it characterizes as the next most important category of
criminal support of a habit, "petty property crime," i.e., shop-
lifting.  Forty-eight percent of the men and 62 percent of the
women studied committed one such crime a week, all violence free.
Alternatively, some 69 percent of women users claimed to trade sex
for drugs or trade sex for money for drugs.  However, this figure
included all forms of drug abuse, which only at that particular
time was largely in behalf of crack cocaine abuse.

The plain fact, nineteen years after passage of the Act, is
that, with respect to economically driven crimes, crack cocaine
has taken the same posture in society as have all the other hard

A-13

drugs.    There  is  no  greater  justification  to  punish  a  crack
offense  for  violence  than  exists  for  punishing  a  heroin  or  powder
cocaine offense.

The  same  result  holds  true  for  the  unspoken  perception  that  a
crack  user  will  exhibit  irrational  or  excitable  violent  behavior.
P.  Goldstein,  Pathways,  p.  25.    With  respect  to  crack  cocaine,
there  is  no  meaningful  violence  distinction  between  its  use  and
that  of  powder  cocaine.    Hatsokami,  et  al.,  supra;  J.  Inciardi,
"The  Crack  Violence  Connection  Within  A  Population  Of  Hard-Core
Adloescent  Offenders,"  Drugs  And  Violence:    Causes,  Correlates,
And  Consequences,  (de  la  Rosa,  et  al.,  eds.)  1990,  p.  92  at  Table
5.    The  overall  incidence  of  psychopharmacologically  based  crime
among  its  sample  of  seriously  delinquent  adolescents  involved  less
than  5.4  percent  of  the  group,  who  reported  "involvement"  in  one
incident  of  irrational  or  drug-induced  violence  in  the  past  twelve
months.    In  comparison,  80  percent  of  the  sample  (611  juveniles)
claimed  involvement  in  a  total  of  18,477  "major  felonies"  in  the
same  time  period.    These  numbers  represent  the  total  for  all  drugs
used,  of  which  crack  cocaine  was  a  proportion.    Other  studies  have
concluded  that  crack  use  just  is  not  a  factor  in  this  area,  espec-
ially  compared  to  alcohol.    J.  Fagan,  "Intoxication  And  Aggres-
sion,"  Drugs  And  Crime,  M.  Tonry  and  J.  Q.  Wilson,  eds.,  1990,  pp.
241,  257  note  4.    Mr.  Fagan's  study  concluded  that  the  typical
crack  user  is  passive  and  sinks  into  "sudden  and  precipitous
depression  following  crack  use."    Id.

These  results  parallel  all  the  results  from  those  studies
performed  in  the  1970's  and  early  1980's  which  have  been  reported

under Congressional Reason I.    There was never, and there is not
today, any legal justification from violence-inherent-in-the-drug
for having enacted a Draconian crack penalty statute.

Finally, for this category, it is uncontestable that crack
dealers competed intensely for newly created and newly vacated
sales turf.    However, the crimes associated with this cause were
not directed at the public in general; rather, the general public
was only accidentally drawn into isolated incidents where youthful
rivals acted with abandon.    All of these instances entered the
news and were touted as proof that society had entered a new and
permanent era of social deterioration, directly as a result of
crack cocaine.    Professionals recognized this as the classical
fallacy of the false generalization.    See the Inciardi "Adolescent
Offender Study," supra, at p. 105 ("The current focus on crack-
related violence may be more of a media event than any emergent
trend.").

When Congress considered this legislation, it was acting
immediately on the heels of the violent consolidation of the
powder cocaine trade by the Colombian cartels in cities such as
Miami, which had produced a murder rate there of 58.8 per 100,000.
Id. at p. 107.    After the Colombian faction gained the control it
was seeking, the homicide rate declined to 33.2 per 100,000 in
1987, falling throughout 1986!    It only rose to a certain extent
above the 1981 floor rate in 1988, when it was 42.5 per 100,000.

These results and causes were always being analyzed in the
F.B.I.    Uniform Crime Reports; Congress certainly possessed the
intelligence background of all its law enforcement agencies.    It

A-15

simply ignored them.  Upon proper review, there was just no prin-
cipled reason to single out crack cocaine legally for a phenomenon
demonstrated to be occurring contemporaneously for powder cocaine
as well.

Of course, by the time of the 1995 Sentencing Commission
Report on Cocaine And Federal Sentencing Policy, the violence phe-
nomenon had run its course.  All the contributing factors had been
even better analyzed:

> "First, crack selling was concentrated in
> neighborhoods where social controls had been
> weakened by intensified social and economic
> dislocations in the decade preceeding the
> emergence of crack.  Second, the rapid devel-
> opment of new drug-selling groups, following
> the introduction of crack, brought with it
> competition.  Accordingly, violence within new
> selling groups internally to maintain control
> and violence externally to maintain selling
> territory . . . was more likely to character-
> ize the unstable crack markets than more
> established drug markets and distribution
> systems."

Quoted from Cocaine And Federal Sentencing Policy, p. 97.

In sum, as legitimate reason for a permanent penalty statute,
the violence connection amounted from the outset to dishonest
propoganda.  The media simultaneously diseminated the propoganda
deemed essential to creating the public law and created a self-
fulfilling violence prophecy by generating law enforcement efforts
to remove established distribution networks with increasing
regularity, and thus destabilize the neighborhoods for new
entrepeneurs.

Speakers presenting papers at the Harry Frank Gugenheim
Foundation Conference, New Orleans, December, 1998, were especi-

A-16

ally critical of the legal treatment of crack cocaine for the drug supposedly being causative of any large percentage of the violence problem.  As an occurence, homicides are isolated events affecting five hundredths of a percent of the overall population; homicides affecting uninvolved persons, although sensationalized in the media, constituted one hundred thousandth of a percent of the population in the most affected neighborhoods.

Alfred Blemstein of Carnegie Mellon University correctly pointed to statistics showing the crack epidemic to have been a period event from roughly 1985 to 1991, parallel to the greatest media and congressional attention.  The escalated homicides of that period was all the result of a small population group, age 24 and under.  History has proved that the problem was "cured" not by one iota of law enforcement but rather by the demographics of that particular generation passing to age.  Id. and Franklin Zimmer-ling, U.S.C.A., Berkley, and George Kelling, Rutgers University, speaking on "Justice Talking," February 27, 2006.

Thus, the law itself has been demonstrated in another category to be serving no legitimate purpose in the suppression of violent crime.

CONGRESSIONAL REASON IV:    Crack Cocaine Exposure Was Creating
                            Exceptional Deleterious Effects On
                            Unborn Children:


The Congress was expecially concerned that crack cocaine was a drug that appealed primarily to poor young people. There was no sympathy expressed for the actual user, but Congress believed its legislation would eventually save the next generation.

Early reports led to the fear that exposure to crack cocaine during pre-natal life caused brain damage to the infant or at least serious intellectual and social impairment. For a review of the information actually available in 1986, see L.C. Mayers, R. H. Granger, M. H. Bornstein, B. Zackerman, Journal of the American Medical Association, Vol. 267, p. 406 (1992). The prediction, of course, was for catastrophic results.

This alleged harm from crack cocaine was not discussed widely during 1986, when the crack penalty law was first contemplated and does not form a stated reason for enactment of the law at that time. However, Members of both Chambers did voice extraordinary concern in 1988 when the Act of that year was considered. 134 Cong. Rec. E2,701 (August 10, 1988) (statement of Representative Vento); 134 Cong. Rec. S17,320 (October 21, 1988) (statement of Senator Helms). In an effort to act more preemptively that year, Congress attempted to establish "demonstration projects" to provide education, hopefully preventative, and treatment to substance-abusing women for all substances. 134 Cong. Rec. E2,933, supra. And so a provision was made for some treatment that year.

The moral appeal of acting to prevent a harm of this type is undeniable.    But, as discussed above, nothing in the Narcotics Penalty Act ever did the slightest thing to reduce the problem. By 1988, some of the Congressional statements were becoming irrational.

> "There is so much crack that we . . . are creating users because the supply is so prevalent."

134 Cong. Rec. H7,704 (September 16, 1988) (statement of Representative Hunter).    Also see 134 Cong. Rec. S17,301 (October 21, 1988) (statement of Senator Helms).    As a result of this supposedly overwhelming crack cocaine use, a whole generation of children was expected to be lost to brain damage and malformity.

While obviously the recreational use of any drug during pregnancy raises serious medical questions, the exceptional dangers atributed to the use of crack cocaine vis a vis any of the other available hard drugs, especially powder cocaine, have been exposed as pure fiction.    Furtunately, it is not necessary to discuss all the studies that have been performed since this "problem" was identified because there are a total of 101 separate evaluations reported in the Robert Wood Johnson database.    B. M. Lester, L. Lagasse, S. Brunner, Journal of Drug Issues, Vol. 282 (October 23, 1998), p. 633.

While not minimizing the harms resulting from even small abusive behavior during pregnancy, the authors of an extensive review of the subject in Science make the critical observation.

> "The small magnitude of the effects is in sharp contrast to the sensationalistic reports

A-19

in popular media on the effects of prenatal
cocaine exposure."

Science, Vol.    , p. 634 (2002).  Overall, in four substantive

categories of congitive development, the net change for the group

of children affected was an increase in percentage of children

scoring in the less than 70 I.Q. group from 2.28% (normal group)

to 3.75% (cocaine-affected group).  While the discussion is highly

statistical, the ultimate prediction nationwide is that the 1.47%

difference in I.Q. level is producing a special educational

service expense between \$4 MM and \$35 MM per year.[7]

Thus, as a factor for the enactment of the Narcotics

Penalties Act of 1986, or its reaffirmation by the Act of 1988,

the belief that crack cocaine was materially more dangerous toward

the wellbeing of prenatal children was medically and scientific-

ally false.  At the time of enactment, of course, there was no

data upon which lawmakers could rely.  Perhaps some lawmaking can

be preemptive in character; but when the reasons for the law are

exposed as fallacious, Due Process demands that the true facts be

taken into account when evaluating the soundness of the law.

---

[7] The reason for this wide disparity of estimates is the wide
disparity in estimates of the number of affected children.  The
statistic reported here includes all cocaine-affected children,
not just crack-cocaine-affected children.  No study was able to
distinguish a powder-abusing mother from a crack-abusing mother by
the child produced from pregnancy.  But the National Institute on
Durg Abuse study of 1992 live births estimated that 45,000
children were affected; the G.A.O. study, "Drug Exposed Infants: A
Generation At Risk," Report to the Senate, gave the same estimate
as 375,000.  Neither estimate was ever reached in fact.

No. 02-1632

IN THE

# Supreme Court of the United States

RALPH HOWARD BLAKELY, JR.
*Petitioner,*

v.

STATE OF WASHINGTON,
*Respondent.*

On Writ of Certiorari
to the Washington Court of Appeals, Division III

REPLY BRIEF FOR PETITIONER

JEFFREY L. FISHER
*Counsel of Record*
DAVIS WRIGHT TREMAINE LLP
2600 Century Square
1501 Fourth Avenue
Seattle, WA 98101-1688
(206) 622-3150

13

> ### (a) It is irrelevant that imposing an exceptional sentence upward is discretionary instead of mandatory.

Both the State and the United States rely heavily on the fact that the Sentencing Reform Act provides only that the court "may" impose an exceptional sentence upon finding an aggravating fact. Wash. Rev. Code § 9.94A.120. Finding such a fact does not "mandat[e]" that the court impose a heightened sentence. Resp. Br. at 21-22; United States Br. at 19-21. To the extent that this detail in Washington law can be characterized as permitting courts to employ their "qualitative judgment" regarding whether to impose an exceptional sentence, it makes no difference for purposes of applying the *Apprendi* rule.

*Apprendi* is not limited to facts that mandate a heightened sentence. Rather, this Court consistently has held that the *Apprendi* rule applies to any fact that causes an "increase in the defendant's *authorized* punishment." *Ring*, 536 U.S. at 602 (emphasis added).[6] The Arizona law invalidated in *Ring*, for instance, did not mandate the death penalty upon the finding of an aggravating fact; such a finding simply "authorize[d]" that penalty, subject to the judge's additional determination there were no mitigating circumstances "sufficiently substantial to call for leniency.'" *Id.* at 593 (quoting Ariz. Rev. Stat. § 13-

---

[6] For numerous other passages using similar formulations, see *Apprendi*, 536 U.S. at 482-83 (*Apprendi* applies to "the determination of a fact that, if found, *exposes* the criminal defendant to a penalty exceeding the [otherwise-applicable] maximum") (emphasis altered); *id.* at 484 (rule applies if "defendant *faces* punishment beyond that provided by a statute" is additional fact is present) (emphasis added); *id.* at 469 (rule pertains to "a factual determination *authorizing* an increase in the maximum prison sentence") (emphasis added); *id.* at 498 (Scalia, J., concurring) (rule applies to all facts that determine "the length of the sentence to which [the defendant] is *exposed*") (emphasis added); *Jones*, 526 U.S. at 243 n.6 (rule applies any fact that "increases the *maximum penalty* for a crime") (emphasis added).

14

703(F)). In *Jones*, this Court likewise applied what became the *Apprendi* rule even though the additional factual finding at issue simply raised the permissible prison sentence from 15 years to "not more than 25 years." *Jones*, 526 U.S. at 230 (quoting 18 U.S.C. §2119(2)). And in *Apprendi* itself, this Court noted that the additional finding at issue was "legally significant" not because it mandated any particular sentence, but because "it increased − indeed, it doubled − *the maximum range within which the judge could exercise his discretion.*" 530 U.S. at 474 (emphasis added).

The reason the *Apprendi* rule applies to any fact that *authorizes* increased punishment is that both the Sixth and Fourteenth Amendments apply to every factual finding that is "legally essential to the punishment to be inflicted." *Harris v. United States*, 536 U.S. 545, 561 (2002); *see also Ring*, 536 U.S. at 603-04 (if some aggravating fact must exist in order for a certain sentence to be imposed, the fact at issue must be treated as element); *Jones*, 526 U.S. at 248 (all facts that "determin[e] a statutory sentencing range" must be treated as elements). A fact that merely authorizes a sentence above an otherwise prescribed statutory limit is just as essential to such a heightened sentence (if one, in fact, is imposed) as a fact that demands such a sentence. Consequently, Washington's permissive exceptional sentence system implicates *Apprendi* just as surely as a mandatory enhancement system would.

> (b) **It is irrelevant that sentencing courts must determine whether the facts they find constitute a "substantial and compelling reason" to impose a heightened sentence.**

The State and the United States also appear to assert that Washington's exceptional sentence system is exempt from *Apprendi* because it involves "qualitative judgments" in the sense that courts must decide for themselves whether certain fact patterns satisfy the Sentencing Reform Act's "substantial